[Civ. No. 6623.   Third Dist.   Dec. 29, 1941.]

T. M. COLLESTER, Appellant, v. EDITH H. OFTEDAHL et al., Respondents.

Lillick, Olson, Levy & Geary, Ira S. Lillick, Allan E. Charles and Edward D. Ransom for Appellant.

John D. Harloe and Walter C. Frame for Respondents.

THOMPSON, Acting P. J.—The plaintiff has appealed from a judgment rendered against him in a suit to enjoin the defendants from soliciting sales and marketing certain gasoline pump "globe signs," and "counter-signs," manufactured by the defendants under contract for the plaintiff. The complaint also demanded an accounting. The cross-complaint charged plaintiff with a breach of contract, and affirmatively asked for $3500 damages for completed signs remaining on hand after plaintiff terminated the contract. After hearing the application for injunction and holding an accounting, the court adopted findings favorable to the defendants on their cross-complaint, but enjoined defendants from soliciting sales of signs from the customers of plaintiff by writing letters to oil companies. The court then awarded judgment to the defendants for the net balance due for 3400 completed signs remaining on hand, in the sum of $1990. From that judgment the plaintiff has appealed.

This is an equitable action. The plaintiff was engaged in selling to oil and gas companies advertising glass globe signs. These signs consist of circular metal backs and rims with reflectors and glass lenses upon which the desired printed matter appeared. The signs contained electric lamps and attachments. Originally these signs were attached to gas pumps at the oil stations. Later a similar device was manufactured and sold by the plaintiff to oil companies as "counter-signs." The plaintiff conducted his enterprise under the name of "Western Trading Company," with his principal place of business at San Francisco. Prior to 1929, he pur-

chased his "globe signs" in the east. To expedite deliveries and save cost he orally arranged with the defendants, who were engaged in a metal manufacturing business in San Francisco under the name of Western Machine & Stamping Works, to make these devices for plaintiff at an agreed cost of eighty-nine and one-half cents apiece. The plaintiff furnished the lenses and electric attachments which he purchased in quantity from the east. To produce the metal frames for these lamps the defendants manufactured the necessary rolls and dies, which were paid for by plaintiff. Under that oral agreement thousands of globe signs were manufactured and sold to plaintiff over a period of about seven years. Similar lamps for counter-signs were also manufactured by the defendants and sold to plaintiff at a cost of about one dollar apiece. The agreement required the defendants to make prompt delivery of the signs to the customers of plaintiff upon receipt of the orders therefor. For that reason the defendants manufactured sign-frames and kept a large number on hand to enable them to make speedy deliveries when they were ordered. Edith Oftedahl testified in that regard:

"We did not calculate to have anything on hand, without discussing it with Mr. Collester; that was agreed upon before we could enter into an agreement—— We would talk that over before we bought the steel. . . . We decided how many frames and countersigns it was deemed advisable to have on hand."

About 1933 or 1934 the cost of steel advanced so rapidly that the parties decided to purchase materials in carload lots to save cost and to guard against a prohibitive selling price for the signs. By agreement the defendants then purchased carload lots of metal consisting of about 18,000 pounds of steel, from which 7000 or 8000 lamps were constructed. A carload of metal cost $1500. The plaintiff advanced to defendants the whole or a part of that initial cost of metal, which was credited to his account and against which the costs of signs were charged as he ordered them for the market until the fund was exhausted, after which he paid for the signs as the bills were presented. In 1934 the plaintiff sold 7784 counter signs. In 1935 he sold 4575 signs. The following year he sold 3059 signs. In 1937 he sold only 498 signs.

On account of the increased cost of labor and materials, the defendants were unable to furnish the signs for the

former orally agreed prices. Some dissension arose between the parties. On February 13, 1937, a written agreement between them was executed. It provided, in part, that,

"Manufacturer agrees to furnish countersigns aluminum painted and equipped with the necessary electrical materials and spring wire as previously furnished and assembled with fired-in glass furnished by purchaser. All countersigns to be packed ready for shipment by manufacturer. The price in lots of 99 or less $1.10 for each countersign. In lots of 100 or more $1.00 for each countersign."

The contract does not specify how many counter-signs will be ordered. It further provides for a guaranty to order "approximately" 1000 globe frames to be 95 cents each. The contract specified the manner of payment as follows:

"In thirty days from date of this agreement the purchaser agrees to pay $200.00 to be applied to purchase of this steel for 1000 globe frames. The purchaser agrees to advance on the purchase of 500 countersigns $250.00 as an advance payment of 50 cents each on the total cost of the countersigns. Purchaser agrees to pay within five days $200.00 as an advance on globe frame orders given. . . . All cartons and glue for countersigns and globe frames to be furnished by purchaser."

At the time of executing this agreement the defendants had on hand about 400 completed globe frames and 4000 counter-signs ready for delivery, as the plaintiff well knew. Pursuant to that written agreement the defendants manufactured and delivered to plaintiff's customers the 1000 globe signs contracted for and 4000 additional frames previously ordered. They also delivered 500 counter-frames. These orders were filled before July of that year.

Subsequently the plaintiff orally ordered from the defendants 215 additional frames. The defendants then demanded another written contract agreeing to purchase at least 1000 frames at the prices and according to the terms of the contract of February 13, 1937, which the plaintiff refused to execute. The plaintiff then terminated their agreement and refused to purchase signs from the defendants. He demanded the dies which he had paid for and they were thereupon delivered to him. With reference to the 3400 completed counter-signs which the defendants had on hand, the plaintiff then said, "I am sorry . . . Miss Oftedahl, that you have these frames on your hands." He refused to pay for them.

In order to dispose of the manufactured frames left on their hands when plaintiff terminated their contract, the defendants wrote letters to five or six oil companies soliciting sales of the signs, and thereby managed to dispose of about 500 frames. This left 3400 counter-signs undisposed of.

This suit was then commenced by plaintiff to enjoin the sales and soliciting of customers for the purchase of signs and to require an accounting for those which had been sold. The defendants answered the complaint and filed a cross-complaint demanding damages for the 3400 frames left on their hands. After the trial the court adopted findings granting an injunction against defendants prohibiting them from soliciting sales by the writing of letters to oil companies, and awarding them judgment on the accounting, as a condition for the enforcement of the injunction, of sixty cents apiece for the counter-signs which were left on their hands at the time of the termination of business relations. This allowance was based on the costs of manufacturing the frames exclusive of the cost of glass lenses and wiring apparatus which the plaintiff was to furnish under previous arrangement. Judgment was rendered accordingly. From that judgment the plaintiff has appealed.

It is contended the findings and judgment are not supported by the evidence.

We are of the opinion the findings and judgment are adequately supported by the evidence. The court was authorized to grant the injunctive relief conditioned upon plaintiff's doing equity to the extent of paying the costs incurred by the defendants in manufacturing frames and signs ahead of actual orders, according to the previous agreement, so that they might be prepared to make prompt deliveries. The market for these signs was confined exclusively to sales to the oil companies. They had no other means of disposing of the frames on hand except to solicit sales thereof to such companies. They were induced to manufacture frames in large quantities ahead of the actual orders by the agreement and conduct of the plaintiff. The court found and the evidence supports the determination that there were no trade secrets involved in the enterprise.

It is a fundamental principle of law applicable to equitable proceedings, that one who seeks equity may be required to do equity, with respect to the subject matter involved, before relief may be awarded. (*O'Brien* v. *O'Brien,*

197 Cal. 577, 584 [241 Pac. 861] ; *Ohanian* v. *Kazarian,* 123 Cal. App. 196 [11 Pac. (2d) 42] ; *Richman* v. *Bank of Perris,* 102 Cal. App. 71 [282 Pac. 801] ; *Cox* v. *Hughes,* 10 Cal. App. 553 [102 Pac. 956] ; 19 Am. Jur. 319, sec. 463, *et seq.;* 28 Am. Jur. 229, sec. 34; 2 Pomeroy's Equity Jur., 5th Ed. 51 Secs. 385, 386.) In the text last cited, the principle referred to is expressed as follows:

"Whatever be the nature of the controversy between two definite parties, and whatever be the nature of the remedy demanded, the court will not confer its equitable relief upon the party seeking its interposition and aid, unless he has acknowledged and conceded, or will admit and provide for, all the equitable rights, claims, and demands justly belonging to the adversary party, and growing out of or necessarily involved in the subject matter of the controversy. . . . The court will give the plaintiff the relief to which he is entitled, only upon condition that he has given, or consents to give, the defendant such corresponding rights as he also may be entitled to in respect of the subject mater of the suit.''

▆ Certainly it would be inequitable for the plaintiff to enjoin defendants from soliciting sales of merchandise in any manner from oil companies without remunerating them for the signs left on their hands with no other available market. It is true that the injunctive relief sought by the plaintiff was granted only in part. Nevertheless the court had authority to grant the relief in part, conditioned upon payment of the cost incurred by the defendants in manufacturing the signs which remained on hand. ▆ Moreover the suit was also one for an accounting which is equitable in its nature. (*Smith* v. *Smith,* 88 Cal. 572 [26 Pac. 356] ; *Stesel* v. *Santa Ana River Water Co.,* 35 Cal. App. (2d) 117, 124 [94 Pac. (2d) 1052] ; 1 Cal. Jur. 167, sec. 27.) In that proceeding the same principle, requiring the plaintiff to do equity, applies. On that accounting, which was demanded by plaintiff, he was given a credit of $50 for the signs which were sold by the defendants, and they were awarded judgment for $1990. This judgment represents the costs incurred in manufacturing the signs by the defendants, pursuant to agreement in anticipation of future orders, which were left on their hands when the plaintiff terminated the business relation.

The judgment is affirmed.

Tuttle, J., concurred.