[Civ. No. 14985.   Second Dist., Div. Three.   May 24, 1946.]

TRANSPORTATION BUILDING COMPANY (a Corporation), Respondent, v. EDWIN M. DAUGHERTY, as Commissioner of Corporations, etc., Appellant.

Robert W. Kenny, Attorney General, and T. A. Westphal, Jr., Deputy Attorney General, for Appellant.

Walker, Adams & Duque and Earl C. Adams for Respondent.

SHINN, J.—This is an appeal by the Commissioner of Corporations from a judgment of the superior court directing the commissioner to issue a permit authorizing plaintiff, Transportation Building Company, to change its capital structure and enter into a contract for the management of its property, if and when the proposed plan is approved by the stockholders of the corporation who are entitled to vote thereon.

The petition for writ of mandate filed by plaintiff incorporated the entire record of the evidence taken before the Commissioner of Corporations. No additional evidence was taken in the superior court. The return by the commissioner to the alternative writ was by general demurrer and also by answer. The demurrer was overruled and an order was made that the petition be granted. Findings and conclusions were filed and a peremptory writ was issued. The ground of

the decision was that certain findings and conclusions of the commissioner upon which he based his refusal to issue the permit were not supported by the evidence adduced at the hearing.

We are in accord with the views of the trial court. It appears clearly to us from the record that the proposed plan of plaintiff is fair, just and equitable, that plaintiff intends to fairly and honestly transact its business under that plan, and that the issuance of the securities and the carrying out of the plan will not work a fraud upon the stockholders of plaintiff whose stock is to be exchanged for new stock to be issued under the plan of reorganization. (See Corporate Securities Act, § 4, Stats. 1917, p. 673, as amended; 2 Deering's Gen. Laws, Act 3814.) Under these circumstances, and in view of considerations hereinafter discussed, it was not within the discretionary power of the commissioner to deny the application.

The property of plaintiff corporation consists of the land and a 13-story and basement, Class A loft type building at the southwest corner of Seventh and Los Angeles Streets in Los Angeles. The building was constructed in 1923, by Standard Holding Company, which authorized the issuance of $625,000 of 6½ per cent bonds. Thereafter Assets Corporation acquired the property, subject to the bonds but did not assume them. The operation of the building was not a successful one. In 1938 the bonded indebtedness was $425,000, but the income had been insufficient to meet the required payments of principal and interest and they were in default. There was a reorganization in bankruptcy and plaintiff corporation was formed to take over the property, with an authorized capital of 14,725 no par shares, consisting of 8,508 shares of preferred and 6,217 shares of common. In acquiring the property through the reorganization in bankruptcy, plaintiff was authorized to exchange its preferred shares and 4,254 common shares to the bondholders of Assets Corporation in units of two shares of preferred and one of common, and approximately $4.13 in cash, for each $100 principal of bonds, and also to issue 1,963 shares of common stock to Assets Corporation. The plan was carried out and the conversion was accomplished with the minor exception that, at the time plaintiff's application was heard by the commissioner, $3,300 face value of bonds had not been converted. At that date there were issued and outstanding 8,442 preferred shares and 6,184

common shares and there were in reserve sufficient shares to exchange for the then unconverted bonds. In February, 1944, the brokerage firm of O'Melveny-Wagenseller and Durst, Inc. purchased from divers owners 5,046 shares of preferred stock and 2,523 shares of common, in units of two shares of preferred for one of common, for a price of $53.60 per unit. A large part of these shares were acquired from Assets Corporation and in that transaction the brokerage firm acquired the additional 1,963 shares of common, paying no additional consideration therefor. The brokers then sold the units so acquired to their customers at $57 per unit and retained the 1,963 shares of common.

In March, 1944, plaintiff filed its application with the commissioner for a permit allowing it to make substantial changes in its articles of incorporation. The capital was to be increased to 8,508 shares of preferred and 10,000 shares of common, both having changed rights, preferences and privileges. (It will not be necessary to mention all the features in which the new stock would differ from the old. The important ones will be taken up in order.) It was proposed to exchange 8,508 shares of new, no par, preferred for the outstanding 8,508 shares of preferred, share for share, or to exchange preferred and common for outstanding bonds on the basis of two shares of preferred and one of common for each $100 face value of bonds; also to exchange 6,217 shares of new common, share for share, for the outstanding common and to sell and issue to the brokerage firm the balance of the 10,000 shares of common, namely, 3,783 shares, at a price of 10 cents per share and the execution of a management contract by the brokers. The proposed management contract was one by which the brokerage firm agreed to manage the building for seven years or until the preferred shares had been fully retired, whichever should occur sooner, and was to receive compensation of not to exceed $50 per month, to be paid to the president of plaintiff corporation, and $25 per month for keeping the records of plaintiff, bookkeeping and auditing.

All the stockholders of plaintiff were given notice of the hearing to be held before the Commissioner of Corporations and this notice was sufficient to inform them in detail as to the changes proposed to be made in the certificate of incorporation and the proposed sale of 3,783 shares of common to

the brokers at 10 cents per share, and the execution of the management contract. The stockholders were invited to attend the hearing but none attended or opposed the granting of the permit. The plan as proposed had three main purposes: first, the removal from the articles of certain restrictive provisions which were obstructing successful management of the business; second, lowering the call price of the preferred shares, and third, to increase the number of common shares for the purpose of selling the additional shares to O'Melveny, Wagenseller and Durst at 10 cents per share as the principal consideration for an agreement by the firm to manage plaintiff's property for a maximum term of seven years. It appears from the findings of the commissioner and the briefs filed in his behalf that he found fault with all the major features of the plan. His findings, as will be pointed out, were almost exclusively in the nature of conclusions as to the merits of the plan from a business standpoint. The trial court made findings differing from those of the commissioner, but with a single exception, which we shall mention later, these also consisted of conclusions drawn from the admitted facts. Stated simply, the appeal brings us (1) a record in which there is no dispute as to the facts; (2) an order of the commissioner refusing a permit, based not upon a finding of unfairness but substantially upon his opinion that it would be unwise for the stockholders to give their approval to the plan, and (3) the judgment of the trial court directing the commissioner to issue the permit, based upon conclusions of the trial judge which were the opposite of those drawn by the commissioner. We are of the opinion that no cause was shown for a denial of the application, and that it was the duty of the commissioner to grant it. In the statement of our conclusions it is necessary to discuss the apparent advantages and disadvantages of the proposal. We should make clear, however, that we consider it to be the right and privilege of the stockholders to decide whether the advantages outweigh the disadvantages, and that our question is whether there are disadvantages which would have justified the commissioner in refusing the permit upon the ground that the plan is unfair, unjust, inequitable or fraudulent.

Petitioner was not seeking a permit to make a public offering of securities, as that term is commonly understood. There was involved only a matter of internal management of a going concern, affecting no one except the present stockholders of

the corporation. Necessarily there can be no amendment of the capital structure unless the present stockholders, after approval of the plan by the commissioner, also approve it in the manner provided by the existing articles.

An analysis of the plan must take as a starting point a definite figure as the present value of the property. It would otherwise be impossible to appraise the fairness of the proposed reduction in the call price of the preferred, or the contract with the brokers. The commissioner found: "That the Commissioner is unable to determine the exact worth of the Transportation Building, the principal asset of applicant, however it does appear that said building is worth in excess of $255,240; . . ." The finding of the superior court was: "It is not true that defendant was unable to determine the exact worth of the Transportation Building nor is it true that said building is worth in excess of $255,240.00 or any amount in excess of $225,000.00." The importance of this finding is obvious. The present preferred stock of plaintiff is retirable at $50 per share upon call, or upon liquidation, which would return a possible maximum of $425,400, or such lesser sum as might be received in case of liquidation, before the common stockholders would receive anything. Under the amended articles the retirement and liquidation price would be reduced from $50 to $30 per share or to $255,240. The commissioner made the following finding: "That the proposed exchange as set forth in said application would reduce the liquidating value of the outstanding preferred shares and bonds from $425,400 to $255,240; that said reduction in liquidating value would redound to the benefit of the holders of common shares; that said exchange of shares would result in the transfer of the voting control of Transportation Building Company from the holders of preferred shares to the holders of common shares." The change in the liquidating "price" per share obviously would not lessen the "value" per share unless the property should be worth more than $255,240, nor would the proposed change in the retirement or liquidating price of the preferred be of advantage to the holders of common stock unless the property has now, or later acquires, a value in excess of $255,240. The evidence before the commissioner was that the present gross value of the property was $225,000 and that if a sale should be made at that price, the net amount received, after payment of commission and expenses of sale,

would be about $213,000 or $26.50 per share for the preferred stock, with nothing for the common. This value of the property was testified to upon the hearing before the commissioner by a competent and experienced appraiser, Mr. W. W. Touchstone. No witness testified to any different value and the testimony of Mr. Touchstone was corroborated by that of the secretary of the company, who testified to a gross value of $225,000. It appears from the evidence taken at the hearing that the deputy commissioner who presided was not dissatisfied with the testimony of Mr. Touchstone, for he stated: ''If there is no objection, I will reserve determination as to whether a formal appraisal will be required by the Commissioner, until the close of the hearing.'' The commissioner did not cause an appraisal to be made, but thereafter made the finding that he was unable to determine the exact worth of the property, but that ''it does appear that said building is worth in excess of $255,240.'' This did not ''appear'' from the evidence. There was evidence that plaintiff had refused the offer of $225,000 but this means no more than that the directors, instead of selling at a price that would not pay the preferred shareholders even $30 per share, chose to retain the property in the hope of getting a better price. ■ The deputy commissioner appears to have given weight to the fact that the federal court, in the reorganization proceeding of 1939, apparently considered it a possibility that the preferred stockholders would receive $425,400, the amount of the unpaid bonds, at some future time, since it fixed a liquidating price of $50 per share. This was not evidence as to value, nor was there anything in the record to warrant a finding that the market value of the property could not be ascertained from the evidence. The commissioner had before him the highest type of expert evidence of value and no opposing evidence of any sort. The only finding consistent with the evidence was the one made by the superior court, namely, that the market value of the property was $225,000 and no more. Upon this basis of value the preferred stockholders will have given up no part of the present value of the shares if they consent to a liquidation price of $30 per share.

Another proposed change in the articles relates to the payment of dividends on the preferred shares. Under the present articles they are payable out of ''net cash receipts,'' regardless of earnings, and at the rate of $2.50 per share, $1.50 of which is cumulative, $1.00 noncumulative. They

have been paid in this manner and there is, at present, no arrearage. Under the proposed amendment the dividends would be payable only out of surplus or net earnings. The commissioner found: "That the net profit from operations of applicant for the year 1942 was the sum of $348.65, and for the year 1943 was the sum of $2,390.55, that because of the provisions of the articles of incorporation of Transportation Building Company allowing the payment of dividends on the preferred shares out of *'net cash receipts'* [emphasis added] there is no arrearage in dividends on said shares; that an amendment of the articles of incorporation vesting voting control of the subject company in the holders of common shares and limiting the payment of dividends to holders of preferred shares so that such dividends could only be paid out of 'surplus and net profits' accounts might result in an early default in dividends; . . ." The superior court found: "It is not true that the proposed amendment to the certificate of incorporation of plaintiff providing for the payment of dividends on preferred shares of plaintiff out of *surplus or net profits* [emphasis added] might result in an early or any default in such dividends." It is immaterial which of these prognostications is the more accurate. The welfare of the corporation does not depend upon uninterrupted payment of dividends regardless of the source of the funds. The commissioner's auditor, Mr. Heyne, testified: "These dividends are in reality distribution of capital by reason of the fact that the company has incurred an operating deficit from its inception to December 31, 1943." The owners of the preferred shares may be dissatisfied with the present policy and wish to change it. They should be allowed that opportunity.

Under the present certificate of incorporation there is a related restriction which interferes with good management. No more than $3,000 may be spent in any one year for repairs, improvements or alterations without the unanimous consent of the board of directors or the holders of a majority of preferred shares, nor more than $5,000 in any one year for such purposes, without the consent of a majority of the preferred shares. This unwise restriction would be removed by the proposed amendment of the articles. According to the testimony of Mr. Touchstone, the expenditure of between $20,000 and $50,000 will be required to put the Transportation Building in repair. He stated it as his opinion that if this is done, the property will be worth $300,000, his theory no

doubt being that the resulting increase in value would be derived through a higher type of operation after the rejuvenation of the building. The present policy of diverting capital to the payment of dividends, with the result that the property has been allowed to deteriorate, and the income has been seriously impaired, is indefensible from the standpoint of good management.

Another objection, emphasized by the findings of the commissioner, and now urged by him, is that the proposed amendment contemplates a change in voting rights. The preferred shareholders now have the right to elect all but one of the directors. Under the proposed amendment the common shareholders would elect the directors except in the event of a failure to pay dividends for a period of 18 months, whether consecutive or not, in which event, and so long as the default existed, the holders of preferred shares would have a right to elect a majority of the directors. The commissioner found: ". . . That said exchange of shares would result in the transfer of the voting control of Transportation Building Company from the holders of preferred shares to the holders of common shares; . . ." Of this change it is said in appellant's brief: "Again, however, this change in rights, preferences and privileges is definitely a loss to preferred shares and properly considered by the respondent [appellant] in determining if the plan is not unfair, unjust or inequitable." The proposed amendment would be in conformity with customary, approved, and sound corporate management. The present scheme for control and management, under which the preferred shareholders have continued to take dividends from capital, is unusual, inadvisable and, in the case of plaintiff corporation, has been demonstrated to be unsound. Clearly this is a change which the stockholders should be allowed to make if they wish to do so. Other proposed changes in the articles are unimportant and need not be noted.

Another of the findings upon which the commissioner appears to base his refusal reads: "That the sale and issuance of 3783 common shares to O'Melveny-Wagenseller and Durst, Inc., as contemplated in said application would result in the control of the management and operation of applicant being transferred from the holders of preferred shares representing an original investment in applicant and its predecessor corporations of $422,100 to a firm representing an investment in applicant of $378.30; . . ." The commissioner's statement

of the case in his opening brief commences with the following paragraph: "The ultimate factual question in this case, to state it rather tartly, is whether the firm of O'Melveny-Wagenseller and Durst, Inc. should be permitted to gain control of respondent company which has assets admitted to be worth $225,000 and found by the Corporation Commissioner to be worth in excess of $255,420, upon investing the sum of $378.30 and agreeing to manage a building, which is the principal asset of respondent company, for a period of seven years."

It is true that the brokerage firm, if it saw fit to retain the stock, would own 5,746 shares of common out of a total of 10,000 shares and could elect a majority of the directors. Perhaps the holders of the preferred would approve this change of control. If they are satisfied to have the brokerage firm acquire a controlling interest of the common stock, it will be their privilege to make the change in the capital structure providing for additional common stock, and if they do not prefer that management they no doubt will vote against the plan. The lack of opposition at the hearing would indicate that they will vote approval of the plan, in the hope that new management will revitalize the business of the corporation. We do not see what hope there can be for improvement of the position of the stockholders, other than by the improvement of management. The commissioner appeared to attach much importance to the fact that the new arrangement might result in a large profit to the brokers. That, we think, is not the question. The building is at the intersection of two important streets in Los Angeles; it is a 13-story store and loft building and the land and building represent an initial outlay of some $900,000. It has never been a successful operation. Messrs. O'Melveny, Wagenseller and Durst are offering to assume the management of the property for seven years. It is not at all inconceivable that they are more interested in the welfare of their clients than they are in any profit they may make out of the undertaking. If the permit is granted and through able management they convert an unprofitable operation into a successful one, so that the common stock becomes of value, they will realize a gross profit of some 57 per cent and the other holders of common stock 43 per cent of any increase in value that accrues to the common stock. For the chance of making this profit they accept a heavy responsibility to their clients, not by the investment of money, but of time and effort, and by putting to the test

their managerial ability. It cannot be said that they have nothing to lose, or that they have been actuated in their proposal solely by a desire for financial gain. ▆▆ The evidence before the commissioner furnished no reason for doubt that the interested parties are acting in good faith, with the welfare of the stockholders in view. If a doubt had existed, it should have been resolved in favor of the applicant. The purpose of regulatory legislation, such as the Corporate Securities Act, is to enable state agencies to make inquiry as to whether good cause exists for withholding approval, and to deny approval if it appears affirmatively that good cause does exist. The presumption of fair dealing is with the applicant and should control unless it is overcome by contrary evidence. If the proposed effort is successful, the stockholders will profit; if it is unsuccessful, it is highly probable that they will be in no worse position than they are at present. In the meantime, the management by the firm, the evidence disclosed, will save the company $1,600 or $1,800 per year in expense, even if there be no increase of income.

The stockholders of plaintiff have a right to be relieved from the burdensome restrictions of their existing capital structure. They should not be compelled to go on depleting their capital and allowing their property to remain in disrepair, and to decay. It is necessary that someone undertake to end the present sad state of affairs. It is the right of the corporation, without the approval of the Commissioner of Corporations, to make a contract with the firm of O'Melveny, Wagenseller and Durst, Inc. for the management of the building, and for such compensation as it may wish to pay the brokers for their efforts. It has not seen fit to do this. It wishes to put its house in order and to remove the obnoxious restrictions from the articles, which have operated as a hindrance and detriment from the beginning. All the corporation is asking is that the stockholders be allowed to decide by two-thirds vote of the holders of the preferred shares (and those are the ones the commissioner feels may be imposed upon) whether the plan submitted for the approval of the commissioner is a desirable one for them to adopt. The question before the commissioner was not whether they should adopt the proposed plan or some alternative plan which might be more advantageous to them. So far as disclosed by the record, it was a question of adopting the proposed plan or doing nothing. The issuance of the permit would at least give the

shareholders a chance, under amended articles, to work out a better plan of management than the one proposed, if they do not approve it. To deny the permit is to encourage a sale of the property in order to avoid further loss through its operation under unwise restrictions.

The conclusions of law, signed by a deputy commissioner, read as follows: "From the foregoing facts the Commissioner of Corporations is unable to find:

"1. That the plan of business of Transportation Building Company as set forth in its application filed with the Commissioner on March 15, 1944, is not unfair, unjust or inequitable;

"2. That the securities that Transportation Building Company proposes to sell and issue as set forth in said application are not such as in the opinion of the Commissioner of Corporations will not work a fraud upon the purchaser thereof."

It is made the duty of the commissioner, by section 4 of the Corporate Securities Act (2 Deering's General Laws, Act 3814), to issue a permit "if he finds that the proposed plan of business of the applicant is not unfair, unjust, or inequitable, that it intends to fairly and honestly transact its business, and that the securities that it proposes to issue and the method to be used by it in issuing or disposing of them are not such as, in his opinion, will work a fraud upon the purchaser thereof." There was a finding that the exchange would redound to the benefit of the holders of the common shares, and there was a finding "that the exchange of shares as contemplated in the said application would not result in the holders of preferred shares receiving considerations commensurate with the advantages to be surrendered by such shareholders to the benefit of the holders of common shares." The commissioner did not find that the plan was unfair, unjust or inequitable nor that a fraud would be worked upon those who would acquire the new stock. There was no dispute whatever as to the facts, and there was no failure to disclose any facts in connection with the proposal. It is a fair, just, and equitable plan unless it is the reverse. It is an honest plan if it is not dishonest. There is no middle ground. The deputy commissioner evidently thought there was, and that without any finding or evidence to support a finding that the plan was unfair, unjust or inequitable, it was his duty to refuse the permit because of his opinion that the shareholders should be able to work out a better deal for themselves.

The order cannot be justified upon the ground that the commissioner was of the opinion that it would be the exercise of poor business judgment for the stockholders to amend their articles and to entrust the management of the property to the brokerage firm. The commissioner's act of refusing to issue the permit was, in effect, a veto of the plan by him, on behalf of the holders of the preferred shares. Such supervisory control of the internal affairs of a corporation, however wisely it may be exercised, is not vested in him. It appears from what we have said that the evidence before the commissioner clearly disclosed that the proposed plan is not unfair, unjust or inequitable, that it is not dishonest in any particular, and that it will defraud no one. If the plan should prove to be unwise or unsuccessful, the responsibility will be that of the stockholders and not of the state.

It is the contention of the commissioner that the trial court exceeded its power in making new findings and conclusions and in directing defendant commissioner to issue the permit as applied for. It is claimed that the trial in the superior court was "*de novo*," and that this practice is forbidden except in cases in which it is sought to revoke an existing permit or license. It is contended that the court is limited to a review of the orders of the Commissioner of Corporations in matters relating to the issuance of securities and may not make new findings and conclusions. It is said that the trial was de novo because the court made findings and drew conclusions from the evidence contrary to those of the commissioner. There was no trial de novo, but only a review. The court received no additional evidence and made no findings upon the evidence which was before the commissioner, contrary to those of the commissioner, in any particular in which the findings of the latter were supported by the evidence. In the respects in which the conclusions of the court differed from those of the commissioner the facts from which the conclusions were drawn were not in dispute. The power to review would be futile if the court could not reach decisions of fact based on unconflicting evidence, and draw conclusions from the findings, which differ from those of the commissioner. The facts adduced at the hearing furnished no legal basis for a denial of the permit, and the court properly issued a peremptory writ directing respondent to issue it.

The judgment is affirmed. The attempted appeal from the order overruling the demurrer is dismissed.

Wood, J., concurred.

DESMOND, P. J.—I concur in the judgment and take occasion to add some observations which to me seem important. The interest of the brokers' firm, O'Melveny-Wagenseller & Durst, Inc., in making a success of the plan under which they proposed to manage the plaintiff corporation is shown in various ways. It first became apparent when they arranged to purchase stock in the corporation in January and February of 1944. The situation is depicted quite clearly in a letter which Mr. Wagenseller, as president of his firm, sent on January 31, 1944, not only to the Transportation Building Company but also to all the shareholders of that corporation. In that letter he said, among other things:

"During the past few days we have purchased, or concluded arrangements to purchase, from your three principal stockholders, 5046 shares Preferred Stock, Transportation Building Company 4486 shares Common Stock, Transportation Building Company representing 59.3% of the Preferred Stock and 72.1% of the Common Stock, at $26.80 for each Preferred share, ex-dividend payable February 15th to stockholders of record February 1st, accompanied by all of the Common Stock. This is equivalent to a price of $53.60 per Unit of 2 shares Preferred and 1 share Common on the basis upon which the stock has heretofore been traded. . . .

"You are no doubt familiar with the operations of our firm in connection with such properties. The undersigned, on behalf of our firm and personally, has for some years past been operating such major loft building properties in the vicinity of your building as the Merchants Exchange Building (directly adjoining your property to the north), Cooper Building, Textile Center Building, Industrial Buildings, Allied Crafts Building, Graphic Arts Building and Lloyd & Casler Building, and several others. We have been most successful in the rehabilitation and operation of these properties and expect to apply the same thought and attention to the operations of the Transportation Building.

"In the near future we expect to propose to the stockholders of your company a plan of recapitalization and certain amendments to the Articles of Incorporation, which will permit the successful operation of the company and its property along the same lines we have used in operating the other properties in which we have an interest.

"At or about the same time we will, if conditions are acceptable to us, give every stockholder who does not care to

continue his interest in the company an opportunity to sell his stock to us at the same price we paid the three largest stockholders. In the meantime, any stockholder desiring to sell his stock at this time may offer the same direct to us for immediate acceptance, at the same price paid the three largest stockholders, whose stock we have purchased.''

It is apparent that when this letter was written the brokers' firm, with a substantial majority of stock, preferred and common, purchased or under option, had control of the plaintiff corporation. Evidence concerning the purchase was, in part, as follows: ''Q. [Addressed to Mr. Wagenseller] And from whom did you buy the shares? A. We bought the shares from the Assets Corporation, from a stockholder by the name of Weiler, from a stockholder by the name of Skinner. Those were the principal purchases. In addition to that we bought quite a number of shares from other stockholders. . . . Q. Were those shares bought in units or bought separately? A. We purchased from the Assets Corporation 2292 shares of preferred and 1146 shares of common in the form of units. Q. What did those units consist of? A. Two shares of preferred and one of common, which we paid $53.66 a unit for. Mr. S———: [Executive deputy conducting the hearing] What did you pay for the common? A. Nothing. They gave it to us for it had no value so far as they were concerned.'' This witness stated ''we didn't solicit the purchase of stock but we made an offer to all stockholders which was the same offer which we had made to the Assets Corporation and to the other gentlemen.''

Inquiry was made concerning the prevailing market price for the units, two plus one, during the five years immediately preceding the purchase by the firm. The price quoted ranged from $20 to $22 per unit. Mr. Wagenseller testified that beginning with the latter part of January ''the stock was $22.00 a unit. Then we came in and bought the stock at $53.60, which was approximately 100% over the highest price it had ever sold for clear back to 1939 and we are still buying it at that figure.''

Having examined the exhibits and having read carefully all the testimony given before the executive deputy of the corporation department, who made the actual findings adverse to petitioner upon which the assistant corporation commissioner signed the order denying the application, I do not believe that the members of the firm of O'Melveny-Wagenseller & Durst, Inc. had any intention of dealing unjustly, unfairly

or fraudulently with anyone, or that their plan would work that way. On the contrary, their policy, it seems to me, was to make money for others as well as for themselves. The first beneficiary of that policy was Assets Corporation which, by dealing with this firm, got rid, at an advanced price, of a load of stock which up to then had been quoted at an extremely low figure. This stock the firm later sold to its clients at a profit of a few thousand dollars, dealing with the stock on a two plus one unit basis so that the purchasers all became owners of preferred and common stock. When the preferred stock shall have been disposed of, as contemplated by the petitioner, the owners will have received for that stock a cash price equaling, at least, the $255,240 minimum value mentioned in the findings drafted by the deputy, and their common stock will have absorbed a substantial portion of the value now inherent in their preferred holdings. This condition, in my opinion, tends to contradict the finding of the commissioner "That the exchange of shares as contemplated in the said application would not result in the holders of preferred shares receiving considerations commensurate with the advantages to be surrendered by such shareholders to the benefit of the holders of common shares." Up to the present time the common stock seems to have had no value. This appears from the italicized statement of Mr. Adams, attorney for petitioner-plaintiff before the executive deputy, noted near the close of the following passage quoted from the transcript, which is enlightening also upon other aspects of the case:

"MR. ADAMS: Mr. Wagenseller, suppose you would not be permitted to recapitalize the company by amending the Articles to eliminate these restrictive features now contained therein which have been pointed out and discussed here in this proceeding, and include the reduction of the redeemable price and liquidation price of the preferred stock from $50.00 to $30.00 a share, would you want your firm and the clients and customers of your firm to retain their stock interest in this Transportation Building?

"A. I should say not.—We have absolutely no interest in the building. We wouldn't want them to retain their interest in the property, but so long as they have an interest in the property we have to protect that interest they have. . . .

"Q. In other words, you believe as an operational proposition that this building can't be operated successfully unless this company recapitalize along the line of an orthodox company?

"A. It cannot be operated successfully, no question about that, and so far as we are concerned, we are not interested in reviving a dead horse for somebody else. We are willing to give to the people interested in this property today everything they are entitled to. In other words, we believe by paying $30.00 a share, these people will get out of their property, $255,000. If that isn't fair, I don't know what in the world is. If they get only $255,000, we won't take a dime, but if they get more than $255,000, we are entitled, by gosh, to half of the profit, if we make the profit. . . .

"Mr. S——— [Executive Deputy] : Mr. Wagenseller, Do I understand the Articles of the Company at the present time restrict the amount of expenditures in excess of $5,000 for repairs unless there is a certain vote by the preferred and common shareholders? A. That is right. Q. In the event that vote of the preferred and common shareholders is sufficient, is there any restriction on the amount you might spend for repairs? A. No. Q. Do you and your clients hold a sufficient vote for that purpose? A. Oh yes. Sure, our clients—as I testified before, we have about 65%—and in the last sixty days since the end of January we have purchased and resold to our clients more than 65% of the preferred, and 76% of the common stock, so we control the situation absolutely from the standpoint of our own clients. Q. Yes. A. But here is a dead horse that has gone on for years. It has been greatly messed up. We are not interested in obtaining the property, or operating the property with all these restrictions around our necks. It has to be cleaned up. We have had an opportunity to get out, and not only that, but in this Management Contract, Mr. Commissioner, we have advised our Board of Directors in the Transportation Building that when this approval is asked of the preferred stockholders and the common stockholders for this recapitalization, that we will renew our offer of $53.60 for this stock. If they don't want to go along they have their choice of disapproving or approving, or selling their stock, which is still the same price we paid Assets Corporation, and which is more than 100% more than they got before. We think we have treated them fairly and honestly, but I will be darned if we want to sit around and operate that property and pay them $50.00,—pay out $425,000.—Life is too short. We are not interested. Today, we come and put in our efforts, and whatever we get after these people have been paid $30.00 liquidation value, which is $255,000, which

is $30,000 more than they have ever been able to get out of the property,—we are willing to pay them $255,000 as a liquidation value and then, after that, the same people still have 43% of the common stock, they still share with us. We are not taking it all. All we have is 57% of this company and they share with us. Q. In other words, if the company succeeds, as you anticipate, they (the shareholders) get $30.00 for the preferred shares and enjoy the prosperity of the company through their stock ownership of the common? A. That is right. We know what we can do with the building. There has been nobody else come along and pick up this company by the boot straps,—it has been a dead horse for a long time. We have connections to do it, we are entitled to a profit, and we don't take the profit until we earn it and the other fellow gets his money. MR. ADAMS: I think that is about your story. . . . Q. [By MR. R———— appearing for the Corporation Department] Now, this application also asks for a permit containing an issuance clause by which the corporation will be permitted to sell 3800 and some shares of common at 10¢ a share? A. That is right. Q. However, if these Articles are amended, the common cannot participate in any dividend until all the preferred has been retired, is that not so? A. That is correct. Q. I have wondered how in the world you could figure a 10¢ value, or $1.00 value, or any value at all, appertaining to that common stock, in view of that provision, which seems to make dividends rather remote on that common stock? A. Dividends are remote on the common stock. By the time the money is spent on that property to fix it up, we will not receive a penny on the property for several years to come. We will have to pay all the preferred off before we can get a dime, and not only pay it off but we will have to pay a profit upon its present current value. Q. Did you have any scheme in putting that 10¢ value on the common stock? Just an arbitrary value. MR. ADAMS: *Mr. Wagenseller was of the opinion his firm would be entitled to the common stock for the value of his contract, the common stock having no value today, but I thought perhaps it being no par stock that it might be better to have the issuance of the common stock supported by a consideration of the value of this contract, whatever it may be, plus 10¢ per share. I think I am entirely responsible for that.* A. I think you will find we followed the same procedure with the Department here, with reference to the Cooper Building and the Mer-

chants Exchange Building, where we can get a like amount of stock under these same conditions. MR. R———: Well those conditions were not an outgrowth of the same situation where you are asking to amend the Articles as you are proposing to do here. A. No,—the only reason we are amending those,— the whole thing is a tax deal. If it wasn't for a tax deal we wouldn't be before you now. We would have bought the property and taken it over during the same time. Q. You took a fair depreciation on the old costs of the building, which was many hundreds of thousands of dollars,—about $600,000, the cost of the building? A. More than that. Q. The building and land came together about $905,000,—about $300,000 for the land value and the rest for the building value? A. That is right. Q. Now you can still use those old depreciation rates whereas if you bought the building you would have to establish a new depreciation rate based on the present consideration of the building? A. That is just exactly what it is. You see, our depreciation is greater than that. We took a depreciation of $15,976.92, that is the depreciation. That means that amount of money is tax money, so far as we are concerned. If we bought this building tomorrow for $225,000, I doubt if we could take more depreciation than $3,000. So we have $12,000 without paying income tax, and in addition to that we have an eight or nine hundred thousand capital set up for excess profits tax, where otherwise that would crucify us. That is all this whole thing is. Otherwise we couldn't monkey with it at all. We would have bought the property the same as we bought other property, and these stockholders are going to be a lot better off than they have been before. They are better off now. They couldn't have gotten more than $22.00 for it in January. Today they have $53.00. MR. R———: Mr. Wagenseller, it may be that the stockholder is actually better off under this new management and under this proposed change, but what I am afraid of is this—it's requesting us to make this decision puts us in the place that should be occupied by a Court. . . ."

As is apparent, ultimately this case was presented to a court, and that court determined upon findings of its own that the findings and conclusions prepared by the representative of the corporation department and adopted by the commissioner were not supported by the evidence. Among the conclusions of the trial court the following is notable:

"At the time of the hearing held by defendant on the ap-

plication of plaintiff, to-wit, May 12, 1944, all preferred and common shareholders of plaintiff acquiesced in the application of plaintiff and the issuance of the permit for which the application was made.''

In addition to this strong argument supporting the fairness of the plan respondent furnishes another of similar import by pointing out that before the proposed change can be finally made the shareholders ''will be called upon by respondent to vote either for or against such amendment in accordance with the provisions of respondent's certificate of incorporation.''

A petition for a rehearing was denied June 21, 1946, and appellant's petition for a hearing by the Supreme Court was denied July 18, 1946. Traynor, J., and Peters, J. pro tem., voted for a hearing.