[Civ. No. 14814. First Dist., Div. One. Feb. 26, 1952.]

REMILLARD BRICK COMPANY, Plaintiff and Appellant, v. REMILLARD-DANDINI COMPANY et al., Respondents; W. S. STANLEY et al., Defendants and Appellants.

406

Johnson, Harmon & Henderson for Plaintiff and Appellant.

Leo R. Friedman for Defendants and Appellants.

PETERS, P. J.—These appeals present another round in the legal battles between the members of the Dandini family, their successors in interest, and the corporations they control or have controlled. Two of these controversies have already been before this court. (*Remillard Brick Co.* v. *Dandini*, 98 Cal.App.2d 617 [220 P.2d 927] ; *Dandini* v. *Dandini*, 82 Cal.App.2d 263 [186 P.2d 41].) According to the briefs and pleadings, other actions are pending in the trial court or are on appeal.

The present controversy involves four corporations and several members of their boards of directors. The corporations are :

1. Remillard Brick Company, the plaintiff, which is wholly owned by Lillian Dandini.

2. Remillard-Dandini Company, one of the defendants, on whose behalf this action was brought. This company has 403 shares of stock, 150 shares of which are owned by the Remillard Brick Company, and 253 shares owned by the Sesennas

(successors to A. O. Dandini, divorced husband of Lillian Dandini) and which were controlled by defendants Stanley and Sturgis, who at all times here involved had the Sesennas' proxy to vote the stock and a contract to buy it. The directors of the Remillard-Dandini Company at all times here involved were defendants Gatzert, Stanley and Sturgis, and Lillian Dandini and her lawyer Johnson.

3. San Jose Brick and Tile, Ltd., is the other defendant on whose behalf this action was brought. All of the stock of this company is owned by Remillard-Dandini Company. Its board of directors consists of Gatzert, Stanley, Sturgis, Den-Dulk, a law partner of Sturgis, and Davis, an employee of Remillard-Dandini Company. The San Jose Brick and Remillard-Dandini Companies are engaged in the manufacture of bricks. Their legal positions are substantially similar, and they will be referred to hereafter as the manufacturing companies.

4. Remillard-Dandini Sales Corporation, and defendant, was organized and is wholly owned, controlled and operated by Stanley and Sturgis.

Stanley was president and general manager of both manufacturing companies, full-time positions, for which he received $400 per month from each for his services. Sturgis was secretary and secretary-treasurer of the two companies, part-time jobs, for which he received $125 a month from each company.

Thus, Remillard Brick Company, the plaintiff, is wholly owned by Lillian Dandini, is a minority stockholder in one of the manufacturing companies, which, in turn, owns all of the stock in the other manufacturing company. Gatzert, Stanley and Sturgis are majority directors of the manufacturing companies, and Stanley and Sturgis wholly own the sales corporation.

This action was brought by Remillard Brick Company to recover, on behalf of the two manufacturing companies, profits made by the sales corporation and Stanley and Sturgis, from the sale of bricks manufactured by the two manufacturing companies. The first amended complaint states three causes of action:

(1) To have certain contracts entered into in 1948 between the sales corporation and the two manufacturing companies declared void, and to recover on behalf of the manufacturing companies all profits made by the sales company from these contracts. By stipulation at the trial the allega-

tions of the complaint on this issue were made applicable to similar contracts entered into in 1949, after the original complaint was filed;

(2) Pursuant to sections 810 and 811 of the Corporations Code to oust Stanley, Sturgis and Gatzert, as directors of the two manufacturing companies, and

(3) To recover for Remillard-Dandini Company from Stanley and Sturgis and Gatzert certain fees paid to Sturgis by that company for services which it is claimed were not for the benefit of Remillard-Dandini Company, but were paid for personal services rendered for A. O. Dandini, former director and president of that company.

The facts as found in the record and set forth in the findings are as follows: The Remillard-Dandini Company was incorporated in 1935 and from that year until 1939 made profits that averaged about $2,500 per year. In 1939 this corporation acquired the other manufacturing company, San Jose Brick. From 1939 until 1946, and particularly after 1941, the profits of both companies increased, and in 1946-7 the two companies showed a net profit, before taxes, of over $45,000.

During these years neither of the manufacturing companies expended very much for capital improvements. From 1935 to 1948, Remillard-Dandini spent but $54,000 for these purposes ($18,000 of which was for a truck in 1936), while from 1939 to 1948, San Jose Brick expended but $21,000 for these purposes. The result was that the equipment in both manufacturing companies was, in 1948, antiquated, and of such a nature that neither company could operate in the winter months. A good deal of this run-down condition of the two manufacturing companies was undoubtedly due to the mismanagement and misappropriations of over $50,000 by A. O. Dandini, former husband of Lillian Dandini. (For this background see *Remillard Brick Co.* v. *Dandini*, 98 Cal.App.2d 617 [220 P.2d 927].) A. O. Dandini transferred his controlling interest in Remillard-Dandini Company to the Sesennas. (For this background see *Dandini* v. *Dandini*, 82 Cal.App.2d 263 [186 P.2d 41].)

Stanley and Sturgis first tried to buy out the minority interest of Lillian Dandini. When she refused to sell, they stated that she would have to fight, and that they would run the company as they saw fit. Accordingly, in 1948, while acting as directors and officers of the two manufacturing companies, Stanley and Sturgis conceived the idea of sep-

arating the sales functions of the two companies from their manufacturing functions, by having the two manufacturing companies, by contract, transfer their sales functions to the sales corporation, wholly owned by them. On January 29, 1948, at a directors' meeting, Stanley and Sturgis proposed that they, as officers of the two manufacturing companies, be authorized by the respective boards to enter into contracts on behalf of the two manufacturing companies with the sales corporation to the end that the sales corporation would handle, exclusively, the promotion and sales of all products manufactured by the manufacturing companies. This resolution was formally adopted by the vote of Stanley, Sturgis and Gatzert. The minority directors, Lillian Dandini and Attorney Johnson, voted "no." In February of 1948, Stanley and Sturgis, acting as officers of the manufacturing companies, caused certain contracts to be entered into between the manufacturing companies and the sales corporation. They acted also on behalf of the sales corporation. These contracts were one-year contracts. In 1949, a similar resolution was passed over the opposition of Lillian Dandini and Johnson, and in February, 1949, similar contracts were entered into for another one-year period. Both the 1948 and 1949 contracts were negotiated by Stanley and Sturgis while acting as officers for all of the contracting corporations. On February 10, 1948, the Sesennas, the record owners of 253 shares of stock in the Remillard-Dandini Company, filed a written consent to the 1948 contracts. A similar consent was filed in January, 1949, to the 1949 contracts. However, prior to the execution of the 1948 contracts, the Sesennas had given the sales corporation their proxy to vote their stock in the Remillard-Dandini Company. Also prior to the execution of the 1948 contracts, Stanley and Sturgis had entered into a contract to purchase the Sesenna stock. This contract to purchase included a provision that Stanley and Sturgis assumed the responsibility for any litigation involving the Remillard-Dandini Company. Thus, prior to the 1948 contracts, for all practical purposes, Stanley and Sturgis had complete control of the two manufacturing companies.

It should be here mentioned that, although the plaintiff alleged the existence of the proxy and the contract to purchase in its complaint, defendants Stanley and Sturgis, in their verified answer, denied the existence of the proxy and contract to purchase the stock. Sturgis denied the existence of the proxy and contract to purchase in his pretrial deposition.

Stanley, at the trial, at first denied the existence of the proxy and contract to purchase, but finally divulged their existence only after the trial judge had practically threatened him with contempt.

The contracts between the manufacturing companies and the sales corporation transferred to the latter full control over the sales of all products, including promotion of sales, manufactured by the manufacturing companies. The sales corporation agreed to sell all products manufactured by the two manufacturing companies "that it is able to market and sell." The sales corporation agreed to purchase all products manufactured by the manufacturing companies on such conditions and prices as sales corporation should judge to be fair and reasonable. A reasonable and fair price was defined as a price that would yield the manufacturing companies a gross profit, before taxes, of not less than $2.50 per thousand bricks manufactured and sold by the sales corporation. The contract was made irrevocable, except by consent of all parties, for one year. While the word "guaranteed" is used in the contract in reference to payments to be made to the manufacturing companies, it is quite apparent from the entire agreement that the sales corporation was under no obligation to pay for bricks that it did not sell. The sales corporation at no time handled any products other than those of the manufacturing companies.

A second agreement with each of the manufacturing companies related to the lease of certain equipment and facilities by the sales corporation, such as office space, trucks, machinery and tools, for which the sales corporation agreed to pay a fixed monthly rental. The sales corporation agreed to repair and maintain this leased equipment.

In this fashion the sales corporation undertook to sell the products of the manufacturing companies using almost exclusvely the facilities and equipment of the manufacturing companies. Undoubtedly, Stanley and Sturgis did a good job, not only in selling but in modernizing the two manufacturing plants. The trial court found that, under these contracts, the sales corporation, in 1948, received profits and paid salaries to Stanley, Sturgis and Gatzert of $55,727.73, while in 1949 such profits and salaries totalled $37,939.60. However, neither of the manufacturing companies declared a dividend in these years.

The trial court found that the 1949 contracts were unfair to the manufacturing companies, were void, and ordered them

cancelled. It ordered the defendants (after making certain adjustments not here challenged) to repay $35,539.60, less $4,400 allowed to Stanley for extraordinary services, and $5,000 for the services of Sturgis. This left a balance ordered repaid of $26,139.60. The trial court did not invalidate the 1948 contracts, and granted no relief as to them.

From this portion of the judgment there are several appeals. The plaintiff, Remillard Brick Company, appeals from that portion of the judgment which fails to invalidate the 1948 contracts, contending that, under the findings, these contracts should have been declared null and void. This plaintiff also appeals from the portions of the judgment which allowed Stanley and Sturgis a total of $9,400 for their services to the sales corporation. Defendants sales corporation, and Stanley and Sturgis, appeal from those portions of the judgment declaring the 1949 contracts void.

On the second cause of action for the removal of the directors, the judgment provides that unless the sales corporation, Stanley and Sturgis shall, within 60 days from the date of the judgment, restore to the manufacturing companies the $26,139.60 provided for in the first part of the judgment, Stanley and Sturgis shall be removed as directors of the manufacturing companies. The sales corporation, and Stanley and Sturgis appeal from this portion of the judgment. Remillard Brick Company also appeals from this portion of the judgment contending that, under the findings, the three majority directors should have been ousted without qualification.

Remillard Brick Company also appeals from the judgment insofar as it denies it any relief on the third cause of action —to recover legal fees paid to Sturgis. This portion of the appeal, however, has been abandoned.

Remillard Brick Company has moved to dismiss several of the appeals taken by the sales corporation, and by Stanley and Sturgis. It is pointed out that on May 31, 1951, Sturgis resigned as a director of the two manufacturing companies. It is urged that this renders moot his appeal from the order directing his conditional removal as director, and it is also contended that this resignation renders moot Remillard Brick Company's own appeal from that portion of the judgment failing to absolutely oust Sturgis as director in the two companies.

It is also contended that the appeal by the sales corporation, and by Stanley and Sturgis, from that portion of the

judgment declaring the 1949 contracts void is moot because, within the 60 days provided in the judgment, these defendants paid the amount involved as directed in the judgment.

This motion to dismiss is without merit. So far as Sturgis' resigning as director of the two manufacturng companies is concerned, Stanley has not resigned, and the two directors are in the same legal position. Moreover, the order of conditional removal involves a charge of fraud against Sturgis, and, whether he has or has not resigned, he is entitled to a review of the validity of that charge.

While it is true that the sales corporation and Stanley and Sturgis have voluntarily satisfied that portion of the judgment requiring them to repay the manufacturing companies $26,139.60, that satisfaction does not prevent them from challenging that judgment. The judgment expressly required that sum to be repaid within 60 days from the date of the judgment or the directors were to be removed from office. Moreover, the judgment, as to the 1949 contracts, finds the directors guilty of fraud. While the voluntary satisfaction of a judgment, generally speaking, will foreclose the right to have it reviewed on appeal, that rule only applies where the payment of the judgment was by way of compromise or with an agreement not to take or prosecute an appeal. (*Reitano* v. *Yankwich*, 38 Cal.2d 1 [237 P.2d 6]; *Estate of Merrill*, 29 Cal.2d 520 [175 P.2d 819].) Here it is quite obvious that the payment was not voluntary, but was paid to keep the balance of the judgment from becoming operative. Moreover, Stanley and Sturgis have the legal right to have an appellate court pass upon the finding of fraud. The motion to dismiss should be denied.

### Additional References to the Findings

Reference has already been made to some of the pertinent facts. The findings are quite lengthy and detailed. There are other findings to which reference should be made. The court found that all of the contracts here involved "were negotiated and agreed upon" by Stanley and Sturgis "acting as agents for and on behalf" of the manufacturing companies and "at the same time as agents for and on behalf of Remillard-Dandini Sales Corporation"; that prior to entering into the contracts the sales corporation had the proxy of the Sesennas to vote their stock, and Stanley and Sturgis had a contract to purchase it, and a contract to assume full responsibility for any litigation involving the Remillard-Dandini Company; that after securing this proxy and these contracts

Stanley and Sturgis "had full control of the policies and acts of the" manufacturing companies, "and had full power to fix the prices and terms" of the 1948 and 1949 contracts; that during the execution of these contracts Stanley and Sturgis continued to act on behalf of the manufacturing companies and to receive wages from them, and acted on behalf of and received wages from the sales corporation; that during this period Stanley was president and manager of the two manufacturing companies; that these were full-time jobs; that as such he had charge of the production and sales facilities of the manufacturing companies for which he received $400 per month from each corporation (prior to his election as director of the manufacturing companies Stanley had made $90 a week selling bricks); that Sturgis was secretary of both corporations and received from each $125 per month for such services; that after entering into the contracts of 1948 and 1949 the sales corporation took over and exercised all of the sales functions that had previously been exercised by the manufacturing companies; that Stanley and Sturgis had a gross total investment in the sales corporation of $2,500; that in carrying out its functions the sales corporation has used the equipment of the manufacturing companies; that this whole setup was "part of a plan" whereby Stanley and Sturgis "obtained profits from the sale of bricks" manufactured by the two manufacturing companies "that ordinarily would go to" the manufacturing companies; that prior to the 1948 and 1949 contracts the manufacturing companies handled the sales of their own products; that it would have been to the best interests of the manufacturing companies to maintain their own sales facilities; that by reason of the control exercised over the companies by Stanley and Sturgis the best interests of the manufacturing companies "have been and now are subordinated to the private and personal interests of" Stanley and Sturgis; "that nothing was done in the handling of the sales of the bricks" of the manufacturing companies "that could not have been done by" Stanley and Sturgis as managers and officers of the manufacturing companies; that prior to trial Stanley and Sturgis concealed the profits they had made and the salaries received by them from the sales corporation; that the only business of the sales corporation was the handling of the bricks for the manufacturing companies; that prior to trial Stanley and Sturgis (in control of all corporations) "failed and refused to divulge the amount of profits" made by the sales corporation under

the contracts, and such information was concealed by them; that prior to trial Stanley and Sturgis denied they had a contract to purchase the Sesenna stock; that when the 1948 contracts were executed the profits of the sales corporation "were speculative"; that the 1948 contracts "were unfair and unreasonable" to the manufacturing companies "viewed as of February 1, 1949"; that the 1949 contracts were "unjust and unreasonable" to the manufacturing companies "at the time of their execution, and said contracts were not entered into in good faith" by the sales corporation and Stanley, Sturgis and Gatzert; that the execution of the 1949 contracts was "unfair, unjust and unreasonable" to the manufacturing companies "and constitutes a violation" by Stanley and Sturgis "of their duties and trusts as officers and directors" of the manufacturing companies, and is a "fraud upon said companies."

### General Comments

The 1948 and 1949 contracts were profitable to the manufacturing companies as well as to the sales corporation. In 1946-47 the net profits of the manufacturing companies were about $45,000. Under the 1948 contracts the manufacturing companies received from the sales corporation net profits of $78,198, while in 1949 they received $47,199. During these periods both plants were rebuilt and rehabilitated. In addition, both manufacturing companies received substantial sums from the sales corporation for the rental of equipment and offices. The sales corporation, wholly owned by Stanley and Sturgis and in which each had a total investment of $1,250, owned no equipment except one truck and trailer and some office furniture.

### Validity of 1948 and 1949 Contracts

The basic questions presented on this appeal revolve around the determination of the trial court that the 1949 contracts were invalid, and its refusal to hold that the 1948 contracts were invalid. The sales corporation, and Stanley and Sturgis, confidently maintain that under section 820 of the Corporations Code, and because the minority stockholder and the minority directors of the manufacturing companies were informed of the interest of Stanley and Sturgis in the contracts, that the 1949 contracts were valid, and that the holding to the contrary is unsound.

Section 820 of the Corporations Code, enacted in 1947 and based on former section 311 of the Civil Code, provides:

"Directors and officers shall exercise their powers in good faith, and with a view to the interests of the corporation. **No** contract or other transaction between a corporation and one or more of its directors, or between a corporation and any corporation, firm, or association in which one or more of its directors are directors or are financially interested, is either void or voidable because such director or directors are present at the meeting of the board of directors or a committee thereof which authorizes or approves the contract or transaction, or because his or their votes are counted for such purpose, if the circumstances specified in any of the following subdivisions exist:

"(a) The fact of the common directorship or financial interest is disclosed or known to the board of directors or committee and noted in the minutes, and the board or committee authorizes, approves, or ratifies the contract or transaction in good faith by a vote sufficient for the purpose without counting the vote or votes of such director or directors.

"(b) The fact of the common directorship or financial interest is disclosed or known to the shareholders, and they approve or ratify the contract or transaction in good faith by a majority vote or written consent of shareholders entitled to vote.

"(c) The contract or transaction is just and reasonable as to the corporation at the time it is authorized or approved.

"Common or interested directors may be counted in determining the presence of a quorum at a meeting of the board of directors or a committee thereof which authorizes, approves, or ratifies a contract or transaction."

It is argued that, since the fact of common directorship was fully known to the boards of the contracting corporations, and because the Sesennas as majority stockholders consented to the transaction, the minority stockholder and directors of the manufacturing companies have no legal cause to complain. In other words, it is argued that if the majority directors and stockholders inform the minority that they are going to mulct the corporation, section 820 of the Corporations Code constitutes an impervious armor against any attack on the transaction short of actual fraud. If this interpretation of the section were sound, it would be a shocking reflection on the law of California. It would completely disregard the first sentence of section 820 setting forth the elementary rule that "Directors and officers shall exercise

their powers in good faith, and with a view to the interests of the corporation,'' and would mean that if conniving directors simply disclose their dereliction to the powerless minority, any transaction by which the majority desire to mulct the minority is immune from attack. That is not and cannot be the law.

Section 820 of the Corporations Code is based on former section 311 of the Civil Code, first added to our law in 1931. (Stats. 1931, ch. 862, p. 1777.) Before the adoption of that section it was the law that the mere existence of a common directorate, at least where the vote of the common director was essential to consummate the transaction, invalidated the contract. (*Caminetti* v. *Prudence Mut. L. Ins. Assn.*, 62 Cal.App.2d 945, 950 [146 P.2d 15].) That rule was changed in 1931 when section 311 was added to the Civil Code, and limited to a greater extent by the adoption of section 820 of the Corporations Code. If the conditions provided for in the section appear, the transaction cannot be set aside simply because there is a common directorate. Here, undoubtedly, there was a literal compliance with subdivision (b) of the section. The fact of the common directorship was disclosed to the stockholders, and the Sesennas, majority stockholders, did approve the contracts.

But neither section 820 of the Corporations Code nor any other provision of the law automatically validates such transactions simply because there has been a disclosure and approval by the majority of the stockholders. That section does not operate to limit the fiduciary duties owed by a director to all the stockholders, nor does it operate to condone acts which, without the existence of a common directorate, would not be countenanced. That section does not permit an officer or director, by an abuse of his power, to obtain an unfair advantage or profit for himself at the expense of the corporation. The director cannot, by reason of his position, drive a harsh and unfair bargain with the corporation he is supposed to represent. If he does so, he may be compelled to account for unfair profits made in disregard of his duty. Even though the requirements of section 820 are technically met, transactions that are unfair and unreasonable to the corporation may be avoided. (California Corporation Laws by Ballantine and Sterling (1949 ed.), p. 102, § 84.) It would be a shocking concept of corporate morality to hold that because the majority directors or stockholders disclose their purpose and interest,

they may strip a corporation of its assets to their own financial advantage, and that the minority is without legal redress. Here the unchallenged findings demonstrate that Stanley and Sturgis used their majority power for their own personal advantage and to the detriment of the minority stockholder. They used it to strip the manufacturing companies of their sales functions—functions which it was their duty to carry out as officers and directors of those companies. There was not one thing done by them acting as the sales corporation that they could not and should not have done as officers and directors and in control of the stock of the manufacturing companies. It is no answer to say that the manufacturing companies made a profit on the deal, or that Stanley and Sturgis did a good job. The point is that those large profits that should have gone to the manufacturing companies were diverted to the sales corporation. The good job done by Stanley and Sturgis should and could have been done for the manufacturing companies. If Stanley and Sturgis, with control of the board of directors and the majority stock of the manufacturing companies, could thus lawfully, to their own advantage, strip the manufacturing companies of their sales functions, they could just as well strip them of their other functions. If the sales functions could be stripped from the companies in this fashion to the personal advantage of Stanley and Sturgis, there would be nothing to prevent them from next organizing a manufacturing company, and transferring to it the manufacturing functions of these companies, thus leaving the manufacturing companies but hollow shells. This should not, is not, and cannot be the law.

 It is hornbook law that directors, while not strictly trustees, are fiduciaries, and bear a fiduciary relationship to the corporation, and to all the stockholders. They owe a duty to all stockholders, including the minority stockholders, and must administer their duties for the common benefit. The concept that a corporation is an entity cannot operate so as to lessen the duties owed to all of the stockholders. Directors owe a duty of highest good faith to the corporation and its stockholders. It is a cardinal principle of corporate law that a director cannot, at the expense of the corporation, make an unfair profit from his position. He is precluded from receiving any personal advantage without fullest disclosure to and consent of *all* those affected. The law zealously regards contracts between corporations with interlocking directorates, will carefully scrutinize

all such transactions, and in case of unfair dealing to the detriment of minority stockholders, will grant appropriate relief. ██ Where the transaction greatly benefits one corporation at the expense of another, and especially if it personally benefits the majority directors, it will and should be set aside. In other words, while the transaction is not voidable simply because an interested director participated, it will not be upheld if it is unfair to the minority stockholders. These principles are the law in practically all jurisdictions. (3 Fletcher, Cyclopedia of Corps. (Perm. ed.), p. 173, § 838, et seq.; 13 Am.Jur., p. 948, § 997, et seq.)

The United States Supreme Court has clearly established these principles. In *Pepper* v. *Litton,* 308 U.S. 295 [60 S.Ct. 238, 84 L.Ed. 281], the court, unanimously, stated the following (p. 306): "A director is a fiduciary. [Citing a case.] ██ So is a dominant or controlling stockholder or group of stockholders. [Citing a case.] ██ Their powers are powers in trust. [Citing a case.] ██ Their dealings with the corporation are subjected to rigorous scrutiny and where any of their contracts or engagements with the corporation is challenged the burden is on the director or stockholder not only to prove the good faith of the transaction but also to show its inherent fairness from the viewpoint of the corporation and those interested therein. [Citing a case.] ██ The essence of the test is whether or not under all the circumstances the transaction carries the earmarks of an arm's length bargain. ██ If it does not, equity will set it aside." ██ Referring directly to the duties of a director the court stated (p. 311): "He who is in such a fiduciary position cannot serve himself first and his *cestuis* second. He cannot manipulate the affairs of his corporation to their detriment and in disregard of the standards of common decency and honesty. He cannot by the intervention of a corporate entity violate the ancient precept against serving two masters. He cannot by the use of the corporate device avail himself of privileges normally permitted outsiders in a race of creditors. He cannot utilize his inside information and his strategic position for his own preferment. He cannot violate rules of fair play by doing indirectly through the corporaton what he could not do directly. He cannot use his power for his personal advantage and to the detriment of the stockholders and creditors no matter how absolute in terms that power may be and no matter how meticulous he is to satisfy technical requirements.

■ For that power is at all times subject to the equitable limitation that it may not be exercised for the aggrandizement, preference, or advantage of the fiduciary to the exclusion or detriment of the *cestuis*. Where there is a violation of those principles, equity will undo the wrong or intervene to prevent its consummation.''

■ This is the law of California. It was the law before section 311 of the Civil Code was adopted, and is the law since. (*Wickersham* v. *Crittenden*, 93 Cal. 17 [28 P. 788]; *Pacific Vinegar etc. Works* v. *Smith*, 145 Cal. 352 [78 P. 550, 104 Am.St.Rep. 442]; *Western States Life Ins. Co.* v. *Lockwood*, 166 Cal. 185 [135 P. 496]; *Isenberg* v. *Sherman*, 212 Cal. 454 [298 P. 1004, 299 P. 528]; *American Trust Co.* v. *California W. S. Life Ins. Co.*, 15 Cal. 2d 42 [98 P.2d 497]; *Lawrence* v. *I. N. Parlier Estate Co.*, 15 Cal.2d 220 [100 P.2d 765]; *Bainbridge* v. *Stoner*, 16 Cal.2d 423 [106 P.2d 423]; *Pasadena Mercantile F. Corp.* v. *De Besa*, 122 Cal.App. 575 [10 P.2d 492]; *Schwab* v. *Schwab-Wilson Machine Corp.*, 13 Cal. App.2d 1 [55 P.2d 1268]; *Angelus Securities Corp.* v. *Ball*, 20 Cal.App.2d 436 [67 P.2d 158]; *Austin* v. *Turrentine*, 30 Cal.App.2d 750 [87 P.2d 72, 88 P.2d 178]; *Saracco Tank & Welding Co.* v. *Platz*, 65 Cal.App.2d 306 [150 P.2d 918].) There is nothing in *Mannon* v. *Pesula*, 59 Cal.App.2d 597 [139 P.2d 336], or *Brainard* v. *De La Montanya*, 18 Cal.2d 502, [116 P.2d 66], or *Transportation Bldg. Co.* v. *Daugherty*, 74 Cal.App.2d 604 [169 P.2d 470], to the contrary. Those cases do not involve situations where a majority of directors have so used their power as to mulct the minority stockholders. No court in California has even condoned such tactics.

Stanley and Sturgis seek to justify their actions on their testimony to the effect that the Sesennas were disgusted with the constant legal difficulties of the companies and refused to approve any rehabilitation of their facilities unless Stanley and Sturgis would take over. This evidence was apparently not believed by the trial court. ■ Significantly enough, the Sesennas were not called to corroborate it. Moreover, even if this evidence were true, it does not explain why Stanley and Sturgis could not do everything they did do as officers and directors of the manufacturing companies.

The findings, and the evidence upon which they are based, compel the conclusion that the trial court correctly decided that the 1949 contracts were unfair and inequitable and constituted a fraud upon the manufacturing companies and their minority stockholder. The trial court correctly set aside those

contracts. That portion of its judgment should be affirmed.

But the trial court failed to set aside the 1948 contracts, although it found that these contracts "were unfair and unreasonable" to the manufacturing companies "viewed as of February 1, 1949." Nevertheless, it did not set the 1948 contracts aside, apparently because it also found that when these contracts were entered into in February, 1948, the profits to be gained therefrom "were speculative." In other words, the trial court seemed to feel that, although the 1948 contracts were subject to the same objections as the 1949 contracts, they should not be set aside because when entered into no one knew whether or not the sales corporation would make profits under them. The 1948 contracts should have been set aside under the same conditions as the 1949 contracts. All of the contracts are voidable not because profits were or were not certain, but because of the inherent nature of the transactions. It would be a strange rule of law that would uphold contracts for the first year, because during that year profits were speculative, but hold that once it has been demonstrated that profits could be made, future contracts are voidable. There is no such doctrine that those false to their fiduciary responsibilities are entitled to the first year's profits gained from their wrongful conduct. The trial court should be instructed to amend the findings, conclusions and judgment so as to provide that the 1948 contracts are invalidated subject to the same terms and conditions, substantially, as are contained in the judgment in reference to the 1949 contracts.

Remillard Brick Company objects to the allowance made by the trial court of $9,400 for the services of Stanley and Sturgis during 1949, pointing out that both men received salaries from the manufacturing companies, and that Stanley's job with those companies was supposed to be full time. It is urged that, since there is a finding that the 1949 contracts were unfair and a fraud on the manufacturing companies, Stanley and Sturgis, as trustees, should not be paid for activities that constituted a breach of their trust. As already indicated, the strict rules applicable to trustees are not applicable to directors and officers. ▮ This is an equitable action. (*Bell* v. *Bayly Bros.*, 53 Cal.App.2d 149 [127 P.2d 662].) The trial court has full power to do equity. (*Collester* v. *Oftedahl*, 48 Cal.App.2d 756 [120 P.2d 710].) The trial court was undoubtedly impressed by the fact that Stanley and Sturgis during 1948 and 1949 did a first-rate job in pro-

moting sales and selling the products of the manufacturing companies, and in carrying out a rehabilitation program for those companies. Had all of these services been rendered directly for the manufacturing companies, as they should have been, they were of such a nature that they would have justified the paying to them of a bonus for extraordinary services, in addition to their regular salaries. The services were no doubt of an extraordinary nature, and for these a director or officer may be compensated beyond his normal salary. (*Bassett* v. *Fairchild*, 132 Cal. 637 [64 P. 1082, 52 L.R.A. 611].) The trial court undoubtedly felt that the salaries given them by the manufacturing companies were not adequate to compensate them for these extraordinary services. This being so, we think that the trial court acted well within its powers in awarding these men $9,400 for their services in 1949. This portion of the judgment should be affirmed, and on the reconsideration the trial court should determine whether Stanley and Sturgis are entitled to any allowance for extraordinary services for the year 1948, and, if so, how much.

The trial court ordered that some $26,139.60 (net profits under the 1949 contracts) be restored to the manufacturing companies within 60 days of the date of the judgment or Stanley and Sturgis should be removed as directors. Stanley and Sturgis appeal, making the same contentions as were made in reference to the portion of the judgment holding that the 1949 contracts should be set aside. For the reasons given in disposing of that phase of the appeal, the appeal by these parties from this portion of the judgment is without merit.

Remillard Brick Company also appeals from this portion of the judgment, contending that the majority directors should have been ousted without qualification. Section 811 of the Corporations Code provides that the court "may" remove a director "in case of fraudulent or dishonest acts or gross abuse of authority or discretion" and "may bar from re-election any director so removed for a period prescribed by the court." The section, by its very terms, indicates that the power is discretionary. The cases, both before and after the adoption of section 811, so hold. (*Wickersham* v. *Crittenden*, 93 Cal. 17 [28 P. 788]; *DeGarmo* v. *Goldman*, 19 Cal.2d 755 [123 P.2d 1].) In the present case Stanley and Sturgis not only are directors of the manufacturing companies, but are its managing officers, and, for all practical purposes, control and have a contract to purchase five-eighths of the outstanding stock. They have demonstrated their managing

ability. Under such circumstances there was no abuse of discretion in permitting them to remain as directors, subject to their return of the profits made by the sales corporation.

Moreover, it should be pointed out that the acts here committed occurred during the years 1948 and 1949. These two men were reelected by the stockholders for the year 1950. It is a general rule that a director will not be removed for acts committed during his term of office if he is subsequently reelected. (*Atkins* v. *Hughes*, 208 Cal. 508 [282 P. 787].)

The appeal from the portion of the judgment disposing of the third cause of action has been abandoned, and the judgment in reference to it should be affirmed.

In reference to those portions of the judgment disposing of the first cause of action, it is ordered: that that portion of the judgment invalidating the 1949 contracts and ordering restitution is affirmed; that insofar as the trial court failed to invalidate the 1948 contracts and to order restitution for that year, the trial court is instructed to amend its findings, conclusions and judgment so as to invalidate the 1948 contracts, and to order restitution for that year subject to substantially the same conditions and terms as are contained in the portion of the judgment relating to the 1949 contracts; that the portion of the judgment allowing Stanley and Sturgis $9,400 for their services in 1949 is affirmed. The trial court is directed, either upon the existing record or by the taking of additional evidence as it may determine, to ascertain whether Stanley and Sturgis are entitled to allowances for extraordinary services in 1948, and, if so, to fix the amount and allow it as an offset from the amount ordered restored for the year 1948.

It is also ordered that the portions of the judgment relating to the second and third causes of action are affirmed.

The motion to dismiss, is denied.

The Remillard Brick Company is to recover its costs on all of the appeals.

Bray, J., and Wood (Fred B.), J., concurred.

The opinion was modified to read as above printed on March 24, 1952, and March 26, 1952.

A petition for a rehearing was denied March 27, 1952, and defendants and appellants' petition for a hearing by the Supreme Court was denied April 24, 1952. Carter, J., was of the opinion that the petition should be granted.