Filed 4/14/21  Rael & Letson v. Clark CA1/4

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| RAEL & LETSON,<br><br>    Plaintiff and Appellant,<br><br>v.<br><br>MICHAEL CLARK et al.,<br><br>    Defendants and Respondents. | A159255<br><br>(San Mateo County<br>Super. Ct. No. CIV523065) |

Rael & Letson (R&L or the company) brought this action against defendants Michael Clark and the Clark Family Partnership (CFP), alleging Clark, the company's chief executive officer (CEO), misappropriated more than $3,000,000 in company funds under the guise of business expenses. Most of the R&L's causes of action were presented to a jury, but the court decided R&L's cause of action for breach of the duty of loyalty.  In an earlier appeal, we concluded the trial court had misinterpreted the jury verdict, and additionally directed the court to reconsider the measure of damages for the cause of action for breach of Clark's duty of loyalty to the company.  (*Rael & Letson v. Clark* (Nov. 20, 2018, A150322) [nonpub. opn.] (*Rael & Letson I*).) In the current appeal, R&L contends the trial court violated our remand instructions and erred in denying certain damages.  We agree with R&L in two respects only, and shall modify the amended judgment accordingly.

1

## FACTUAL AND PROCEDURAL BACKGROUND

### A. Factual Background

#### 1. *Ownership of R&L*

We begin by quoting at length from our opinion in *Rael & Letson I*:[1] "R&L provides actuarial services for public employers and multi-employer trust funds in connection with their pension and health and welfare plans. Clark is an actuary, and he began working for R&L in 1969. He acquired all of the company's stock by 1986, after the retirement of Edward Letson and the death of Juan Rael, two of its founders. He was its sole shareholder until 2003. . . .

"In 2003, Clark sold 75 percent of his shares in R&L to its employees, through a trust (the ESOT, or the trust) for $7,706,250, in what is referred to as the ESOP (employee stock ownership plan) transaction. To finance the purchase, the ESOP entered into a promissory note (the ESOT promissory note), which included interest paid to Clark. Clark remained CEO and director of the company until 2013. Clark's employment with R&L was suspended in April 2013, after the company learned he had misappropriated its funds.

#### 2. *The Financial Transactions*

"R&L's bookkeeper, Celeste Koski, was responsible for writing checks to pay bills. She reported to Clark and acted at his direction. It was Koski's understanding that Clark was the only person who managed R&L's cash

---

[1] We take judicial notice of the appellate record in *Rael & Letson I*. Additions or alterations to the quoted portion of our opinion in *Rael & Letson I* are in brackets. Deletions are indicated by ellipses. Because we are deleting discussions of transactions not at issue in this appeal, the numbering of some of the sections is different than it was in the original. A fuller summary of the facts is found in our prior opinion.

flow.  Beginning in 2007, R&L used the QuickBooks accounting program, which prompted Koski to record checks in certain categories, such as office supplies, travel, medical, or entertainment.  If Koski was uncertain which category to apply, she would seek guidance from Clark or R&L's chief financial officer, Jim Rhein.  Clark would give Koski bills that he wanted her to pay and direct her to write the checks, telling her how he wanted them to be categorized.  For instance, on one occasion, Clark asked Koski to write a check for $13,120.68 to Bank of America and charge it to 'travel other.'[2]  At Clark's direction, Koski made payments into Clark's personal Vanguard investment account and that of his family partnership, and paid Clark's personal credit cards bills and charges for his home utilities, airplanes, and car.  Koski did not see backup documentation for the expenses Clark submitted for reimbursement, and Clark did not seek approval from anyone else.

"Two new trustees, Paul Graf and Alexandra Willson (the trustees), were appointed in May 2012.  They hired a new financial consultant, a firm called Chartwell.

"Chartwell asked for a report showing how much R&L had paid each of its vendors, and R&L's chief operating officer, Heidi Hagler, requested and received such a report.  After reviewing it, she became concerned that some of the expenses, such as payments to a country club and to Clark's personal credit card, might not be proper.

"Hagler investigated further and found that Clark had given Koski invoices for different vendors.  He directed her to account for them in the

---

[2]  "R&L's 2012 balance sheet had multiple subcategories for individual employees' travel, including 'Travel—Clark, Mike,' as well as a final, apparently catch-all, category of 'Travel—Other.' . . .

categories of travel, employee benefits, and education conferences, and in some cases the expenses had been deducted from income. She reported the matter to R&L's board of directors (the board), and on April 18, 2013, the board removed Clark as CEO and suspended his employment with pay.

"The board also authorized an independent forensic accounting of R&L's books and records from 2003 to 2013. R&L engaged John Kawamoto, a certified public accountant, for this task in April 2013. He found approximately $900,000 in payments made during 2011 and 2012 that appeared to be questionable or fraudulent. Many of these transactions had little or no supporting documentation and were for large dollar amounts. It appeared to Kawamoto that Clark was using these funds for his personal use. He reported his preliminary findings to the board, which terminated Clark's employment.

"Kawamoto continued his investigation to include the years back to 2004, just after the ESOP bought a share of R&L. For the years 2004 through 2013, he found a total of $3,633,872 in charges that appeared to be used for Michael Clark's personal activities rather than legitimate business expenses (the upper range). He also calculated a lower range, which assumed that some of the charges reflected reasonable business expenses; the total for the lower range was $3,194,129. For the period beginning in 2007, when R&L began using QuickBooks, he calculated the upper range total as $3,178,106 and the lower range total as $2,994,336.

"These charges fell into several categories: aviation expenses; country club dues and related charges; rent overpayments; offset of income; interest overpayments; and a more general category of 'Wine, Food, Gas, Phone, Medical, Furniture, Vacations, Residence, . . . , Cars, etc.' [We summarize here the charges pertinent to the issues in this appeal.]

4

### a. Aviation

"Clark, who had a pilot's license, had owned a Piper Malibu airplane since 1990. He had homes in Woodside, California, and La Quinta, California, and he stored the Piper in [hangars] convenient to R&L's Foster City offices and his Southern California residence. He charged costs related to the Piper to R&L, including fuel, landing and takeoff fees, insurance, and [hangar] costs, as well as his annual training for his pilot's license.

"Clark used the Piper for company travel up and down the West Coast. He testified that when he first got his pilot's license in 1980, Juan Rael suggested to him that he use his license for business purposes. After the ESOP transaction, Clark did not get approval from the board for continuing to charge these expenses to the company; however, everyone in the company knew he had a plane and many employees flew with him to business meetings. He used the Piper to fly from his La Quinta home, where he lived nine months of the year, to the company's office in Foster City and to meet with clients in the Bay Area. Clark testified that flying privately was an efficient use of time; he could get to Sacramento in 18 minutes and to Fresno in 40 minutes. He also testified that he did not use the Piper for personal travel between the time of the ESOP transaction and the termination of his employment.

"Clark owned a 1/16 ownership interest in a second airplane, which he purchased from Avantair in 2007 for $415,000. He also paid a management fee, which included 50 hours of flight time per year; the fee in 2007 was $116,362.56. He directed Koski to pay an amount equivalent to the management fee and—over the course of several years—the cost of acquiring the Avantair airplane to an account owned by CFP. Clark directed Koski to

5

pay Avantair directly for fuel-related charges, providing redacted invoices and having the charges categorized as 'travel other,' 'educational expenses,' or 'employee benefits.' No R&L employee other than Clark used the Avantair plane, and he did not disclose to the board that CFP owned the plane and he was having R&L pay for it. R&L paid approximately $801,000, either directly to Avantair or to CFP for charges relating to the Avantair plane.

### b. Country Clubs

"R&L paid all or part of Clark's dues and fees for five golf or country clubs, four in the La Quinta area and the Peninsula Golf and Country Club (PGCC) in San Mateo. Clark's membership at the PGCC was a family membership, and he and his wife both incurred expenses there, including locker room charges, food, and drinks, which R&L paid at Clark's direction. The charges at one of the other clubs[, the Hideaway,] included many items for Clark's wife, such as a cooking class, spa treatments, and haircuts. Kawamoto calculated the total club charges that were personal in nature during the post-ESOP period to be $295,745.

"Clark testified that when he joined the PGCC in 1976, Rael told him the company would pay the monthly club fees as long as Clark paid for the membership. After the ESOP transaction, Clark did not disclose to the board that R&L was paying his golf club membership dues and expenses. [¶] . . . [¶]

### c. Overpaid Rent

"R&L entered into a ten-year lease on its office in Foster City in April 2006, personally guaranteed by Clark. Rather than having R&L pay the rent directly to the landlord, Clark directed Koski to pay funds for 'rent' into CFP's Vanguard account, and used those funds to pay the rent due to the landlord. Kawamoto's investigation showed that the amount deposited into CFP's account exceeded the amount due under the lease by a total of

6

$632,606. Clark testified that he kept the excess rent because he had negotiated a good deal on the property, and because he 'thought [h]e should get something' to compensate him for the personal guarantee. He did not disclose to the board that he was collecting more for rent than was due to the landlord. [¶] . . . [¶]

d. Interest Overpayments

"R&L made the installment payments on the ESOT promissory note directly into Clark's personal Vanguard account. Between 2007 and 2011, R&L paid Clark $136,243 more than was due [under] the note. There was no indication anyone other than Clark directed the overpayments.

e. Other Charges

"Kawamoto also identified a series of other improper or questionable expenditures.

"At Clark's direction, R&L paid his personal credit card bills in full. The credit card bills included charges for items such as dry cleaning, gasoline, grocery stores, department stores, wine transactions of hundreds of dollars each, television service, cable, appliances, medical services, prescription drugs, a jewelry store, termite and pest services, a pool and patio vendor, pizza, a hardware store, and a garage door vendor. [On occasion, Clark paid the credit card bills himself and directed R&L to reimburse him through his personal Vanguard account.]

"Clark had some of the wine purchases categorized as 'office supplies.' He testified that it was his practice to give bottles of wine as gifts to clients, but he acknowledged that he might have used some of the wine personally.

"Clark had R&L . . . pay thousands of dollars for medical services, including concierge medical services for himself and his wife, that were not covered by the company's medical insurance plan. He testified that R&L had

7

a longstanding policy of paying uninsured medical expenses, but he did not disclose to the board that he continued to charge medical expenses to the company after the ESOP transaction. Trustee Willson denied that R&L had such a policy.

"At Clark's direction, R&L paid for Clark, his wife, his son, his daughter-in-law, and his granddaughter to travel to Hawaii and stay at a resort for a week, at a total cost of almost $20,000. Clark and his son met with two prospective clients while he was in Hawaii. He testified he brought his family with him because he thought the prospective clients were also bringing their families and he expected to socialize with them, but their families did not accompany them. Also, Clark's son, an architect, had previously worked with the prospective clients. Clark did not tell anyone on R&L's board that he was bringing his family on the trip.

"Clark went to London to play in a golf tournament. He did not recall whether he disclosed to anyone on the board that R&L would be paying for the trip. He testified that he participated at the invitation of a Canadian prospective client, and he thought of the trip as a business opportunity.

"Clark had R&L pay the lease payments for his cars, as well as $28,011 for the purchase price of a BMW at the end of a lease.

"R&L also paid various other personal expenses for Clark, including residential water services, utilities, phone service, and window washing.

"Kawamoto calculated that R&L paid $1,127,823 for the category 'Wine, Food, Gas, Phone, Medical, Furniture, Vacations, Residence, . . . , Cars, Etc.' His 'lower range' estimate was $810,174.

## B. Procedural History

"R&L brought this action against Clark, his wife Susan Clark, and CFP, alleging several causes of action. By the time of trial, R&L had

8

dismissed its causes of action against Susan Clark. Causes of action for breach of fiduciary duty and breach of the duty of loyalty against Clark, and for fraudulent concealment, fraudulent misrepresentation, and money had and received against Clark and CFP, proceeded to trial. The cause of action for breach of the duty of loyalty was tried to the court, and all other causes of action received a simultaneous jury trial.

"The jury found in favor of R&L on all causes of action. It awarded damages of $1,672,845 against Clark and $1,267,129 against CFP. The court interpreted the verdict to reflect a total award of $1,672,845 against both defendants, rather than separate awards against them for a total of $2,939,974.

"The trial court issued a statement of decision regarding the cause of action against Clark for breach of the duty of loyalty. . . . The court found he had breached the duty in only two respects: the charges for the purchase and use of the Avantair private jet, and excess rent on R&L's office building. The court characterized the remaining expenses as 'luxurious "old school" business practices,' and concluded Clark did not breach his duty of loyalty in incurring them. The court stated its award of $1,433,646 was 'concurrent, duplicative, and less than the monetary damages awarded by the jury verdicts on the identical evidence, and is not in addition to those amounts.'

"The court therefore entered judgment against Clark and CFP for $1,267,129 jointly and severally, and in the additional amount of $405,716 against Clark only. The court awarded prejudgment interest only for the period after the verdict." The jury rendered its verdict on November 19, 2015, and the court entered judgment on October 3, 2016, and, after ruling on posttrial motions, entered an amended judgment on December 6, 2016.

After this factual summary in *Rael & Letson I*, we reached several legal conclusions. First, we concluded the trial court erred in interpreting the jury verdict, and that the verdict, properly understood, awarded a total of $2,939,974 in damages against Clark, with CFP jointly and severally liable for $1,267,129 of that amount. Next, we concluded that the trial court properly denied prejudgment interest on the jury award because the verdict might have already included interest, but that it erred in denying prejudgment interest on the court's own award of damages for breach of the duty of loyalty because those damages were sufficiently certain to support such an award. Finally, we ruled the evidence did not support a conclusion that Clark's " 'old school' " expenditures were all undertaken to further R&L's interests rather than his own, nor that the board implicitly authorized these expenditures.

We therefore directed the court to make findings as to which of the challenged expenses were incurred in violation of Clark's duty of loyalty, to award appropriate damages, and to determine whether those damages were sufficiently ascertainable to support an award of prejudgment interest. We explained that the director owes a corporation a fiduciary duty of loyalty, under which " 'a director cannot, at the expense of the corporation, make an unfair profit from his position. *He is precluded from receiving any personal advantage without fullest disclosure* to and consent of *all* those affected.' (*Remillard Brick Co. v. Remillard-Dandini* (1952) 109 Cal.App.2d 405, 419 (*Remillard*), italics added.)" Our disposition directed the trial court to recalculate both damages for the breach Clark's duty of loyalty and prejudgment interest on the award, and to modify the judgment to reflect either the correct jury verdict or a larger award from the trial court.

10

Upon remand, the trial court issued an order stating that it would issue a postappeal statement of decision based on the evidence already presented at trial, without the necessity of a hearing.

The trial court issued its "Proposed Amendment to Statement of Decision on Court Issue After Trial" in April 2019, awarding R&L $3,950,784, calculated as actual damages of $2,578,536 plus seven percent prejudgment interest of $1,372,249 and, after further proceedings, a "Final Amendment" to the statement of decision on October 10, 2019. The court awarded prejudgment interest totaling more than $900,000 for the previously awarded Avantair and excess rent charges. It also awarded additional damages for Clark's breach of fiduciary duty, e.g., for having R&L pay for his personal credit card charges, personal medical care for him and his wife, personal vehicle expenses, personal phone bills, residential utility bills and window washing, country club dues and expenses, other miscellaneous personal expenses, and a large portion of the Piper airplane charges. The court declined to award damages for overpayments on the ESOT promissory note, and awarded no damages for the period from 2004 to 2006, before R&L began using QuickBooks.

After correcting a computational error to increase the award for the Piper airplane charges by $6,250 and denying R&L's motion for a new trial, the court issued an "Amended Judgment" awarding damages against Clark of $4,035,581, as to which CFP was jointly and severally liable for $1,267,129. R&L has appealed from this judgment.

## DISCUSSION

### I.  Calculation of Postjudgment Interest

The first question we face is whether R&L is entitled to postjudgment interest from the date of the original judgment or from the date of entry of

11

the amended judgment. The resolution of this question will depend on whether the trial court's action in response to *Rael & Letson I* was in effect a modification or a new judgment after a reversal. (See *Chodos v. Borman* (2015) 239 Cal.App.4th 707, 712 (*Chodos*).) The date from which postjudgment interest should run is a question of law, which we review de novo. (*Ibid.*, citing *Roden v. AmerisourceBergen Corp.* (2010) 186 Cal.App.4th 620, 658.)

The trial court's judgment after the remand calculated prejudgment interest at seven percent per year on the items subject to prejudgment interest, through the time of the amended judgment. R&L contends *prejudgment* interest should be awarded only through the time of the original 2016 judgment, and that interest after that time should be treated as *postjudgment* interest, which carries a ten percent annual rate. (Code Civ. Proc., § 685.010, subd. (a); cf., Civ. Code, § 3287, subd. (c) [prejudgment interest no more than 7 percent].)

R&L bases its argument on the wording of the disposition in *Rael & Letson I*, which provided: "The judgment is reversed. On remand, the trial court is directed, consistent with the views expressed in this opinion, to (1) recalculate damages for the breach of Clark's duty of loyalty, (2) recalculate prejudgment interest on that award, and (3) modify the judgment to reflect either a jury verdict making a damage award of $2,939,974 against Clark, with CFP jointly and severally liable for $1,267,129 of that amount, or a larger total award from the trial court." Thus, R&L contends, the trial court was authorized only to modify, not to amend, the original judgment. The trial court rejected this argument, ruling, "[a]s the original decision was reversed and remanded with instructions, the old judgment is no longer

viable, the jury verdict is not the basis of calculation of the damages for the new judgment, and an Amended Judgment will be entered."

A judgment bears interest from the date of its entry in the trial court, even though it is still subject to attack on appeal. (*Chodos*, *supra*, 239 Cal.App.4th at p. 712; Code Civ. Proc., § 685.020.) "When a judgment is *modified* on appeal, whether upward or downward, the new sum draws interest from the date of entry of the original order, not from the date of the new judgment. [Citations.] On the other hand, when a judgment is *reversed* on appeal, the new award subsequently entered by the trial court can bear interest only from the date of entry of such new judgment." (*Stockton Theatres, Inc. v. Palermo* (1961) 55 Cal.2d 439, 442–443, italics added; accord, *Munoz v. City of Union City* (2009) 173 Cal.App.4th 199, 203 (*Munoz*).)

Whether an appellate disposition constitutes a reversal or a modification—and hence, the date on which postjudgment interest begins to run—"depends on 'the substance of the order' and not 'mere formalism.' " (*Munoz*, *supra*, 173 Cal.App.4th at p. 203.) An order of an appellate court "is 'a reversal in the legal sense' when it reverses the trial court and remands an issue to the trial court for further hearing and factfinding necessary to the resolution of the issue forming a basis for appeal." (*Chodos*, *supra*, 239 Cal.App.4th at p. 713.) But where "an order stated in terms of reversal amends a trial court order on remand to 'state what it should have stated on th[e] date' of the original order, it is 'in law and in fact, a modification.' " (*Ibid.*)

Applying this rule, our high court in *Snapp v. State Farm Fire & Casualty Co.* (1964) 60 Cal.2d 816, 817–820 held that where a trial court's judgment holding an insurer liable for only a portion of the policy amount was reversed on appeal with directions to enter judgment in the amount of

13

the policy limit, interest on the resulting award should run from the date of the original award. The court explained, "The legal effect of that reversal was to determine that as of the date of the original judgment plaintiffs were entitled to $25,000. Thus the original judgment was increased from $8,168.25 to $25,000, based solely on the record then before the appellate court. *No issues remained to be determined.* No further evidence was necessary. Thus the so-called 'reversal' with directions, was, in fact and in law, a 'modification.' " (*Id.* at p. 820, italics added.)

The rule that we look to the substance and effect of an order to determine when postjudgment interest begins to run has been applied consistently. In *Munoz*, the court concluded a modification, rather than a reversal, took place where the appellate court reversed a judgment and directed the trial court to enter a new judgment based on the jury's original calculation, noting that "there was no factual determination to be made, no prerequisite to be satisfied before liability could be allocated properly," and concluding that "[s]ince the plaintiffs' entitlement to recovery was established by the original judgment," postjudgment interest ran from the date of that judgment. (*Munoz, supra,* 173 Cal.App.4th at pp. 206–207; see also *Ehret v. Congoleum Corp.* (2001) 87 Cal.App.4th 202, 204, 210 [appellate decision reinstating original jury verdict and calculating offsets based on original jury verdict treated as modification rather than reversal]; *Espinoza v. Rossini* (1967) 257 Cal.App.2d 567, 568, 573 [where trial court granted JNOV after judgment was entered on jury verdict, and appellate court subsequently reversed with direction to enter judgment in amount of jury verdict, interest ran from time of original judgment].) As explained in *Lucky United Properties Investment, Inc. v. Lee* (2013) 213 Cal.App.4th 635, interest begins to accrue when the trial court "fixes the amount due or errs in fixing the

14

amount due but that error is corrected on appeal without the need for further factfinding in the trial court.  When, on the other hand, the amount due is not and cannot be fixed until after further factfinding on remand from appellate review, interest does not accrue until the final determination is made.  *In either case, it is the correct fixing of the amount of the award that triggers the accrual of interest.*"  (*Id.* at p. 654, italics added.)

These authorities persuade us that the trial court correctly concluded postjudgment interest began to accrue only upon entry of the amended judgment after remand.  As pertinent to this issue, our opinion in *Rael & Letson I* concluded two things:  (1) the jury's verdict reflected an award of $2,939,974, and (2) the trial court must make new findings as to which expenses were incurred in violation of Clark's duty to loyalty and award prejudgment interest for such damages that were sufficiently ascertainable.  To that end, we reversed the judgment and directed the trial court to make those calculations.  The trial court engaged in the factfinding we mandated and, having reached a sum that was greater than the jury verdict, awarded the larger amount in damages.  These facts fall squarely within the rule that postjudgment interest accrues from the date the amount due is fixed—in this case, from the time of the amended judgment after remand.

Against this conclusion, R&L points out that in *Rael & Letson I*, after reversing the judgment we directed the trial court to "*modify* the judgment to reflect" either the correct jury verdict or a larger award from the court.  (Italics added.)  This argument might have more force if the trial court's award on remand was less than the amount of the correct jury verdict, which would have resulted in an award of $2,939,974, the amount fixed by the jury.  But although our disposition employed the term "modify," the substance of what the trial court did was to make an award that was different from, and

15

greater than, the original judgment, as we authorized. In the circumstances, the trial court correctly concluded that interest did not accrue until, after additional factfinding, the court fixed the amount due.

In reaching this conclusion, we acknowledge that, as R&L points out, the amount of actual damages the trial court calculated on remand, $2,578,535.53, was less than the award calculated by the jury, and the reason the trial court's award of $4,035,580.86 was greater than the jury award was the addition of prejudgment interest measured up to the date of the amended judgment. R&L argues that the comparison of the two awards must be based on the same date; that is, according to R&L, in deciding the amount of the award, the trial court should have calculated the value of the actual damages and prejudgment interest *as of the date the jury made its award*. This contention is unpersuasive. First, R&L makes no showing that the trial court's amended award would have been smaller than the jury award even if it had included prejudgment interest only through the time of the jury award, an outcome we will not assume in light of the relatively small difference between the court and jury awards and the extended length of time since Clark's wrongful acts began. In any case, the fact remains that the trial court did *not* make its larger award on the same date the jury did; nor did it on that date find the facts necessary to support the larger award it subsequently made. Rather, it engaged in additional factfinding after remand and rendered an award at that time.

## II. Damages for Pre-QuickBooks Period

The trial court declined to award damages for breach of Clark's duty of loyalty during the period between the ESOT transaction in 2003 and the adoption of the QuickBooks accounting program in 2007 (the "pre-QuickBooks period"). It cited several factors driving that decision: the

16

evidence showed that R&L had preserved its financial records only from 2007 onward, its previous records having been lost, destroyed, or deleted; R&L had no audited or independently prepared financial statements from before 2007; Kawamoto had never before served as a forensic expert at trial; and R&L's "financial record keeping was shoddy and its financial oversight nonexistent" in the pre-Quickbooks era. The court explained that R&L had "attempted to cobble together potential losses in prior years, in various fashions: based upon some source documents, extrapolations on what expenses were charged in later years, [a] theory of percentage of revenue based upon later years, assumption[s] of past conduct based upon subsequent conduct, etc." The evidence, the court found, was "speculative, hypothetical, inconclusive, and not meeting the burden of proof by a preponderance of the evidence."

R&L contends the trial court erred in declining to award damages for the pre-QuickBooks period for his dues and expenses for two country clubs, and for charges to two credit cards: Piper airplane-related expenses on his "WorldPoints" credit card and miscellaneous personal expenses on his "Alaska Airlines" credit card. The parties agree on the standard of review for such a challenge. Where the trier of fact has concluded that the party with the burden of proof did not carry that burden, the question in an appeal challenging that finding is " 'whether the evidence compels a finding in favor of the appellant as a matter of law. [Citations.] Specifically, the question becomes whether the appellant's evidence was (1) "uncontradicted and unimpeached" and (2) "of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding." ' " (*Dreyer's Grand Ice Cream, Inc. v. County of Kern* (2013) 218 Cal.App.4th 828, 838 (*Dreyer's*).) We review all factual matters in the light most favorable to the prevailing party and in support of the judgment. (*Ibid.*)

17

*Country Club Charges*

Clark testified at trial that since the time of the ESOP transaction, it was his regular practice to have R&L pay all his dues and expenses for at least two of his country clubs, PGCC and the Hideaway.[3] Based on his review of the records these clubs provided through discovery, Kawamoto calculated that the payments for the years 2004 through 2006 totaled $64,924.08. The records include invoices and an enumeration of the expenses Clark incurred from 2003 through 2013. In light of Clark's own admission and this documentary evidence, which Clark makes no effort to challenge or impeach, we conclude the evidence shows unambiguously both the amount of the charges and the fact that R&L paid them. The trial court concluded all of the country club charges calculated by Kawamoto for the QuickBooks period were incurred in breach of Clark's duty of loyalty, and there is no basis for a different conclusion as to the charges in the earlier period. The trial court erred in failing to award damages for this period. Because Clark has made no effort to challenge Kawamoto's calculation here, we conclude the amount of the award for charges at PGCC and the Hideaway for the pre-QuickBooks period should have been $64,924.08.

*Credit Card Charges*

R&L also contends the trial court improperly denied damages for charges on the WorldPoints and Alaska Airlines credit cards in the pre-QuickBooks period. Clark testified that from the time of the ESOP transaction he had R&L pay credit card charges that he considered to be business expenses, and that he charged to the company all his out-of-pocket

---

[3] R&L does not raise any specific issue regarding payments for any of the other clubs of which Clark was a member during the pre-QuickBooks period.

expenses for the Piper airplane. Kawamoto testified that he reviewed R&L's bank statements from 2006 through 2013 and determined that R&L had paid the full amounts of the credit card bills, so he assumed that the same occurred in the earlier years. He also testified that the records available for the pre-QuickBooks period were limited to bank statements for 2006, credit card statements, invoices from two country clubs, and tax returns, much of this information obtained through third party discovery. R&L's bank statements prior to 2006 were unavailable.

As to the personal aviation charges on the WorldPoints credit card, we conclude R&L has met its burden to show the trial court erred in limiting damages to expenses incurred beginning in 2007. The WorldPoints card was used primarily for expenses related to Clark's Piper airplane, although Clark also used it for such business expenses as car rentals. Kawamoto calculated aviation-related charges on this card of $35,601 for 2004, $32,133 for 2005, and $44,107 for 2006, for a total of $111,841 in the pre-QuickBooks period. For the full years from 2007 onward, Kawamoto calculated aviation-related charges on this card that ranged from approximately $22,000 to $28,000, amounts that the trial court accepted—to the penny—when awarding damages for use of the Piper during the QuickBooks period.

There is no indication that the charges at issue were any different in the two time periods. Clark testified that his practice of charging all of his out-of-pocket costs for the Piper airplane to R&L did not change from the time he bought it until 2013. We discern no basis to treat the Piper airplane-related charges on the WorldPoints credit card any differently in the two time periods at issue here. The trial court thus erred in failing to award damages for the personal aviation-related expenses charged to the WorldPoints card in

19

the pre-QuickBooks period in the same manner as it did from 2007 onward. We shall discuss the amount of the appropriate damages below.

We reach a different conclusion as to the Alaska Airlines card. This card was used not only for expenses that were clearly personal, such as wine, medical care, and groceries, but also for expenses that had business purposes. For the period after R&L began using QuickBooks, the trial court accepted Kawamoto's calculations of the amounts attributable to personal expenses, concluding that, to the extent any of the charges "were legitimately tied to R&L endeavors, the time to have made such allocation was at the time the bills were submitted for payment." But that does not mean the court was required to accept all of his calculations, even for the earlier period when R&L's records were incomplete. R&L does not draw our attention to anything in the voluminous record that documents what credit card charges were made before 2007, that shows the charges were not in fact incurred in the course of company business, or that proves the amounts that R&L paid. R&L has not met its burden to show there was uncontradicted, unimpeached evidence of such weight as to leave no room for a judicial finding that there was insufficient evidence to support an award of Alaska Airlines credit card payments in the pre-QuickBooks period. (See *Dreyer's*, *supra*, 218 Cal.App.4th at p. 838.)

## III.   ESOT Overpayments

Kawamoto calculated that R&L paid Clark $136,243 more than was due on the ESOT promissory note between 2007 and 2011. In our original opinion, we noted that there was no evidence anyone but Clark had directed these payments and that Clark had made no effort in his appellate brief to show that the overpayments did not further his private interests at the expense of the company. These payments were included in the category of

20

expenses as to which we directed the trial court to "make findings as to which of the challenged expenses were incurred in violation of Clark's duty of loyalty and award appropriate damages."

On remand, the trial court declined to include any overpayments in its calculation of damages, finding that R&L had failed to demonstrate by a preponderance of the evidence the existence or amount of any interest overpayments. For this conclusion, the court relied on the following: The promissory note was payable over ten years from December 2003 until December 2013, but was in fact paid off early, by December 2011. Kawamoto acknowledged that the ESOP trustees, rather than R&L, should have made the payments on the promissory note, and they should have calculated the loan payments. The payments, however, were not "correlated to the terms of the promissory note." The court was not provided with the calculations made by Kawamoto and R&L regarding the amount of the overpayments or with the underlying evidence or data, and, the court noted, Kawamoto testified any overpayment could have been the result of a good faith calculation mistake.

The court went on: "There is *no* document or testimony laying out any analysis of all payments of principal (with amount and date) and all payments of interest (with month and date). There is *no* evidence of any table of the interest rates used by Kawamoto and his interest calculations thereon, upon which he bases his opinion and calculations regarding alleged overpayment of interest. He admitted it was hard to track payments to the loan, and that payments were made randomly. . . . [H]e has no expert opinion as to payments made (or not made) during the years 2004, 2005 and 2006 [citation.] Kawamoto opines that certain payments were for interest rather than principal, but does not present evidence of what the specific

21

payments were, how much was towards principal, how much was towards interest, and how he calculated/determined [what] was or should have been interest versus principal—he simply testified that his methodology was to take payments and treat them as interest first and then principal, and provides a total per year of what he determined to be the overage of interest only, *with no detail or supporting calculations or documents*. The court is not required to accept, as the trier of fact, the opinion of an expert for which the underlying foundational facts were not presented, and thus uncertain. Unlike some other categories of damages sought by Plaintiff, as to which the evidence was that *none* of the expenses were legitimate, there is no doubt that Clark was entitled to payments of principal and interest on the specific ESOP promissory note." (Fn. omitted.) The evidence, the trial court concluded, was "simply too sporadic and unsubstantiated" to support an award of damages for interest overpayments.

R&L contends the court erred in so ruling, arguing the unrefuted evidence establishes Clark overpaid himself in the amount of $136,243. In support, R&L notes that Kawamoto testified about how he calculated the overpayment, indicated that for an accountant like himself the calculation was not complicated, and calculated the amount precisely. R&L also argues the court's expression of skepticism about Kawamoto's expertise—based on his use of the wrong interest rate when calculating prejudgment interest— was unfounded. Moreover, R&L points out, the company's chief financial officer and ESOT trustee, Alexandra Willson, likewise testified that her own calculations revealed overpayments of more than $100,000, although she could not recall the precise amount. And, R&L argues, Clark neither refuted nor challenged this evidence.

At trial, Kawamoto testified that he calculated the interest payments by looking at payments made to Clark's personal Vanguard account that appeared to relate to interest or principal on the promissory note. Beginning with the balance as of December 31, 2006, he applied an interest rate of the prime rate plus one percent, in accordance with the promissory note, for each month. By these calculations, Kawamoto concluded, Clark was paid $136,243 more than he was owed. But his testimony also revealed some uncertainty about what payments to use in these calculations and that "it was hard to track what the payments were for and how they pertain to the terms of the loan."

While the evidence before the court might well have been sufficient to support an award of the overpayments Kawamoto identified, the question before us is whether the evidence *compels* such an award. (See *Dreyer's*, *supra*, 218 Cal.App.4th at p. 838.) In asserting that it does, R&L points out that in the course of denying a motion during trial for a directed verdict on the claim for overpayment of the interest, the trial court said that "the evidence [was] undisputed that there was an overpayment," and that there was no evidence that Kawamoto's calculations were wrong. But at the same time, the court noted the evidence—which it said "seemed reasonable"—that Clark thought someone was keeping track of the payments in a manner consistent with the contract, which had an interest rate that changed monthly with changes to the prime rate. Plaintiff has not shown there was " ' "no room for a judicial determination" ' " that the evidence did not support a finding either of the amount of any overpayments or that they were made in violation of Clark's duty of loyalty to R&L. (*Dreyer's*, at p. 838.)

We reject R&L's contention that the trial court's ruling on this issue is barred by the doctrine of law of the case. This doctrine "dictates that an

23

appellate court's holding, on a rule of law necessary to an opinion, must be adhered to throughout the case's subsequent progress in the trial court and on subsequent appeal, as to questions of law (though not as to questions of fact)." (*City of West Hollywood v. Kihagi* (2017) 16 Cal.App.5th 739, 749; see *People v. Boyer* (2006) 38 Cal.4th 412, 443.) The doctrine does not apply to "arguments that might have been but were not presented and resolved on an earlier appeal." (*Leider v. Lewis* (2017) 2 Cal.5th 1121, 1130.) However, it does apply to "questions not expressly decided but implicitly decided because they were essential to the decision on the prior appeal." (*Estate of Horman* (1971) 5 Cal.3d 62, 73.)

R&L argues this doctrine applies because in our earlier opinion, we noted that Clark did not even try in the respondent's brief to show that the ESOT note overpayments did not further Clark's private interests at the expense of the company. But we did not consider the accuracy of Kawamoto's calculations on this point in the earlier appeal; rather, the question we addressed was whether the trial court erred in treating these payments together with airplane costs, country clubs, and miscellaneous personal expenses collectively as "luxurious 'old school' business practices," rather than analyzing each to determine whether they were incurred in breach of Clark's duty of loyalty. Rather than compelling the trial court to award any particular amount in damages, we directed it to look again at the evidence to determine which expenses violated Clark's duty of loyalty. Our prior opinion did not bar the trial court from concluding the evidence on this point was insufficient to support an award.

R&L argues, however, that the trial court's ruling on this point is fatally inconsistent with its decision to award damages for Avantair charges and rent overpayments, matters that it contends also required complex

calculations, and with its acceptance of Kawamoto's testimony, without documentation, to show damages from credit card payments for personal expenses. But there is no indication these matters involve either varying interest rates or discrepancies that the court concluded might have been caused by a good faith mistake as to the amount due. On this record, the court was not obligated as a matter of law to award damages for overpayments on the ESOT promissory note.

Because we reach this conclusion, we do not consider the trial court's alternate finding that R&L lacked standing to challenge the ESOT overpayments.

## IV.    Other Payments into Clark's Personal Vanguard Account

Kawamoto calculated that $185,261.08 of amounts Clark directed R&L to pay into his personal Vanguard account ("Vanguard 0062") between 2007 and 2011 were attributable to Clark's personal expenses. The trial court awarded no damages for these payments, and R&L contends this was error.

The court's final statement of decision did not discuss R&L's claim for these payments, except to say, "Plaintiff erroneously contends in its Objections that the Court's decision does not address the Vanguard 0062 account. The evidence is that the payments made by Plaintiff directly to the Vanguard 0062 account pertained to the ESOP promissory note." This conclusion may have been based, at least in part, on Kawamoto's testimony at trial that the "vendor folder" for the Vanguard 0062 account contained no supporting documentation, but that he "learned that there were notes, there were directives, or at least some indication of what those charges pertain to. In particular, they pertained to [an] ESOP note payment or interest payments were some of the notations we saw." The court also stated at the conclusion of the final statement of decision, "All other claims for damages

25

are denied for lack of sufficient supporting credible evidence, and thus a failure to prove by a preponderance of the evidence."

In his brief on appeal, Clark acknowledges that some of the payments into the Vanguard 0062 account may have been unrelated to the ESOT note, but he argues R&L has failed to show what payments fall into that category.

In support of its claim that the unrefuted evidence shows it suffered damages from transfers unrelated to the ESOT note, R&L points to exhibits showing Clark directed various payments into the Vanguard 0062 account, some of which he said should be attributed to such items as travel, office supplies, "Ed. conf.," "Ee Ben Medical," professional fees, repair and maintenance, and subscriptions. The problem with these payments is that for most of them, R&L does not point to any documentation indicating they were not based on legitimate business expenses, and we cannot conclude the evidence compels such a finding.

R&L also points, however, to evidence that Clark occasionally paid his credit card bills himself and directed R&L to reimburse him with payments to the Vanguard 0062 account. And on three occasions in 2008, R&L points out, the record shows Clark directed payments of precisely the amount of his credit card bill into his Vanguard 0062 account. And the credit card statements associated with two of those payments—for $17,525 and $10,745 respectively—contain multiple entries for charges at grocery stores, drug stores, cleaners, wine, television service, and other items that, on their face, appear unconnected to R&L's business. We recognize that, with respect to the credit cards bill that R&L paid directly, the trial court deemed all of the charges to be personal. But not all of the charges on the statements Clark himself paid are necessarily unattributable to proper business expenses, and this isolated evidence is insufficient to show the court erred in not awarding

26

damages for the sweeping amounts Kawamoto calculated for payments to the Vanguard 0062 account for Clark's personal expenses.

We reach the same conclusion as to R&L's claim for amounts it paid directly to Clark between 2007 and 2013, totaling $56,668. None of the evidence to which R&L directs our attention—neither Kawamoto's testimony, nor his report, nor R&L's profit and loss statements—includes documentation or any other evidence of the nature of those payments. Indeed, in the testimony upon which R&L relies, Kawamoto testified he concluded a transaction was personal in nature because it lacked supporting documentation. Whether or not this evidence would have supported a conclusion that the payments were for Clark's personal advantage at the expense of R&L's, it does not *compel* such a finding. (See *Remillard*, *supra*, 109 Cal.App.2d at p. 419; accord, *Angelica Textile Services, Inc. v. Park* (2013) 220 Cal.App.4th 495, 509 [corporate officers and directors may not " ' "use their position of trust and confidence to further their private interests" and must "refrain from doing anything that would work injury to the corporation" ' "].)

R&L argues, however, that we should not imply findings to support the trial court's denial of these amounts. The extent of its argument in its opening brief, unsupported by authority or further analysis, is the bald statement that because the trial court made no specific finding of ultimate facts relating to these claims, there is no implied factual finding. We first note that a point that lacks reasoned analysis and citation to authority may be treated as waived. (*Okasaki v. City of Elk Grove* (2012) 203 Cal.App.4th 1043, 1045, fn. 1.) In its reply brief, R&L belatedly draws our attention to *Thompson v. Asimos* (2016) 6 Cal.App.5th 970, but this case does not assist it. *Thompson* explains that where a proper request for a statement of decision

27

has been made, the court must issue a statement of decision " 'explaining the factual and legal basis for its decision as to each of the principal controverted issues at trial,' " and that if the statement of decision does not resolve a controverted issue, and the omission is brought to the court's attention, " 'it shall not be inferred on appeal . . . that the trial court decided in favor of the prevailing party as to those facts or on that issue.' " (*Id*. at p. 981, quoting Code Civ. Proc., §§ 632 & 634.)  Furthermore, " '[t]he trial court is not required to respond point by point to the issues posed in a request for statement of decision.  The court's statement of decision is sufficient if it fairly discloses the court's determination as to the ultimate facts and material issues in the case.' " (*Thompson*, at p. 983; accord*, Ermoian v. Desert Hospital* (2007) 152 Cal.App.4th 475, 499–500.)  The court here addressed at length many of R&L's specific claims, awarded damages accordingly, and concluded that all other claims were denied for a lack of "sufficient supporting credible evidence, and thus a failure to prove by a preponderance of the evidence."  This statement sufficiently encompasses R&L's claim for transfers to Clark's Vanguard 0062 not already discussed in the statement of decision and payments directly to Clark.

## V.    Piper Airplane Expenses

Clark had R&L pay all of his out-of-pocket expenses for the Piper airplane, such as fuel, maintenance, insurance, and the cost of hangar storage.  After the ESOP transaction, he never received formal permission to continue charging the Piper airplane costs to the company, but he testified that "everybody in the company" knew of the plane and many employees flew with him to business meetings and he assumed they "thought [he] was expensing something."

28

In our prior opinion, we explained that the evidence that flying in the Piper Airplane was an efficient way to make certain business trips, that board members knew he used the airplane for business, and that before the ESOP transaction Rael had suggested he use his pilot's license for business purposes "might show that not all of the expenses R&L challenges furthered Clark's private interests at the expense of the company" for purposes of a breach of his duty of loyalty. Noting also the evidence that Clark had R&L pay for a multitude of other personal expenditures, we remanded the matter for the trial court to make findings as to which of the expenditures in question violated Clark's duty of loyalty.

On remand, the trial court noted that Clark's use of the airplane to travel on R&L business was not a secret and that in fact he flew members of R&L's board and senior officers for company business, found that he charged R&L only for actual out-of-pocket expenses and that he did so because it was more efficient than driving or using a commercial airline, and explained there was no evidence he made secret profits on the airplane. Pointing to evidence that it is a valid business expense for corporate executives to travel on business by private plane, the court also noted that the amount of the expenses must be reasonable. The court found that the total amount Clark charged to R&L for the airplane was not reasonable and set $2,000 a month, or $24,000 a year, as a reasonable amount for this business expense. The court did not explain how it arrived at this figure. The court subtracted $24,000 a year from the total costs of $451,220 (an amount later adjusted to correct a computational error), for a total damage award for this item of $301,220.

R&L contends it was improper for the court to reduce its recovery for the Piper airplane expenses in this manner. It argues first that the court did

29

not follow our remand instructions; that is, according to R&L, the trial court improperly used an "employee business expense reimbursement rubric" to analyze the Piper airplane expenses rather than making findings about whether Clark breached his duty of loyalty in this respect, and in particular whether he disclosed his practices to the company or received its consent. We are unpersuaded. As we explained in our earlier opinion, the duty of loyalty bars one from "mak[ing] an unfair profit from his position" or "receiving any personal advantage without fullest disclosure to and consent of *all* those affected." (*Remillard*, *supra*, 109 Cal.App.2d at p. 419.) Although the trial court did not expressly recite this standard, its finding that some portion of the Piper airplane costs Clark charged to the company were incurred legitimately in the course of openly carrying out R&L's business was in effect a finding that—however inappropriate it may have been to charge all of the Piper costs to the company—to that limited extent Clark was not making an unfair profit or receiving a personal advantage from the company.

R&L argues, however, that the amount the trial court attributed to legitimate costs of using the Piper airplane for company purposes—$2,000 a month—is not supported by evidence in the record. In setting this amount, R&L contends, the court improperly relied on evidence outside the record. (See *Heap v. General Motors Corp.* (1977) 66 Cal.App.3d 824, 830–831 [improper for trial court to base findings on its own observations and experiences, when contrary to evidence introduced].) We see nothing in the record to indicate the court looked to extra-record evidence or its own experiences in making its determination. And, as Clark points out—albeit without citing authority—a court may properly make an approximation of the amount of damages a party has sustained, so long as the determination of damages is supported by substantial evidence. (*Johnson v. Cayman*

*Development Co.* (1980) 108 Cal.App.3d 977, 983.) It is the appellant's burden to demonstrate error in this determination. (*Ibid*.)

R&L has not met its burden. The evidence of how Clark used the Piper airplane is derived from his credit card bills and other invoices that show charges at airports. Kawamoto testified that approximately 80 percent or more of the Piper airplane's flights were between the airports in Thermal and Hayward that Clark used to travel to and from his home in La Quinta, trips on which his wife sometimes accompanied him, and the evidence shows R&L's policy was not to reimburse employees for the costs of commuting between their homes and work, and that the policy applied to Clark as well. But Clark also testified that he used the Piper airplane for business trips, that he did not use it for personal travel, and that many of his visits to the Bay Area were to attend meetings with clients. Moreover, Clark, rather than the Company, paid for the Piper airplane when he acquired it in 1990. On this limited record—bearing in mind that any calculation must necessarily be an approximation—the trial court could reasonably attribute roughly one-third of Clark's Piper airplane expenses to charges that did not violate his duty of loyalty to the company.

The same monthly allowance for business-related use of the Piper should be allocated against aviation expenses charged to the WorldPoints credit card during the pre-QuickBooks period. Accordingly, $2,000 a month— or a total of $72,000—should be deducted from the $111,841 in Piper-related charges for 2004 to 2006, for an additional damage award on this item of $39,841. We note that the total amounts attributable to the Piper were significantly larger in the QuickBooks period, when the trial court included in its calculation not only payments on the WorldPoints card, but also direct payments to vendors for hangar rental, repairs, and insurance. Although

31

records of any such expenses for the pre-QuickBooks period were unavailable, there is no basis to conclude the cost of Clark's business-related use of the Piper airplane was any different in the two time periods.

## VI.    Prejudgment Interest

R&L argues prejudgment interest should be awarded on all of the amounts it seeks on appeal.  To the extent we agree the trial court properly denied recovery for these items, this question is moot.

Civil Code section 3287 authorizes prejudgment interest on damages that are "certain, or capable of being made certain by calculation" where the right to recover is "vested in the person upon a particular day."  (Civ. Code, §3287, subd. (a); *Flethez v. San Bernardino County Employees Retirement Assn.* (2017) 2 Cal.5th 630, 640.)  The primary purpose of such an award is to "compensate the plaintiff for the loss of use of money during the period before the entry of judgment, in order to make the plaintiff whole."  (*Uzyel v. Kadisha* (2010) 188 Cal.App.4th 866, 919 (*Uzyel*).)

Damages are certain or ascertainable if the defendant knows the amount of damages or could compute the amount from reasonably available information, but not if damages must be determined from conflicting evidence.  (*Uzyel*, *supra*, 188 Cal.App.4th at p. 919.)  Put another way, this standard is met " 'where there is essentially no dispute between the parties concerning the basis of computation of damages if any are recoverable but where their dispute centers on the issue of liability giving rise to damage.' " (*Fireman's Fund Ins. Co. v. Allstate Ins. Co.* (1991) 234 Cal.App.3d 1154, 1173.)  On appeal, we determine independently whether damages are certain or ascertainable for purposes of Civil Code section 3287.  (*Uzyel*, at p. 919.)

Applying these standards, we conclude the damages attributable to PGCC and the Hideaway during the pre-QuickBooks period support an

award of prejudgment interest.  It is worth noting that, in awarding damages for county club charges from 2007 onward, the trial court concluded they were sufficiently certain to award prejudgment interest.  As to the earlier period, the clubs provided records showing the amounts and dates of all payments made on Clark's account.  Clark draws our attention to no dispute about the amount of the payments to be awarded; rather, the only issue was whether he breached his duty of loyalty by directing R&L to pay those amounts.

As to the charges related to the Piper airplane, however, a determination of the amounts properly attributable to costs that served Clark's advantage at the expense of R&L's interests, as opposed to those properly incurred in carrying out R&L's business, could not readily be calculated without a judicial determination based on conflicting evidence. (*Uzyel*, *supra*, 188 Cal.App.4th at p. 919.)  R&L points to the rule that prejudgment interest "cannot be defeated by setting up an unliquidated counterclaim as an offset." (*Chesapeake Industries, Inc. v. Togova Enterprises, Inc.* (1983) 149 Cal.App.3d 901, 907; accord, *Howard v. American National Fire Ins. Co.* (2010) 187 Cal.App.4th 498, 535–536.)  But the trial court did not calculate an offset to an obligation that could be determined with certainty; rather, it looked to conflicting evidence to calculate the share of the Piper airplane charges that violated Clark's duty of loyalty.  We conclude, as did the trial court, that these damages were not sufficiently certain to support an award of prejudgment interest.

### DISPOSITION

The amended judgment is modified to reflect (1) an additional $64,924.08 for PGCC and Hideaway charges during the pre-QuickBooks period, (2) an additional $39,841 for Piper airplane expenses during the pre-

33

QuickBooks period, and (3) an award of prejudgment interest on the PGCC and Hideaway charges, the exact amount of which the trial court is to calculate on remand.  As so modified, the judgment is affirmed.  The parties shall bear their own costs on appeal.


                                        TUCHER, J.


WE CONCUR:

POLLAK, P. J.
STREETER, J.


*Rael & Letson v. Clark* (A159255)